# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| SU MIN KIM and JI HUN KIM, | § | |
|    *Plaintiffs*, | § | |
| | § | |
| v. | § | Civil Action No. 4:19-CV-00332 |
| | § | Judge Mazzant |
| AMERICAN HONDA MOTOR CO., | § | |
| INC., | § | |
|    *Defendant*. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court are Defendant's Renewed Motion for Judgment as a Matter of Law (Dkt. #138) and Defendant's Motion for New Trial (Dkt. #139). Having reviewed the motions, responses, and applicable law, the Court finds that both motions should be **DENIED.**

## BACKGROUND

On June 30, 2018, Ji Hun Kim ("Ji Hun") was driving a 2014 Honda CR-V in the eastbound direction on Warren Parkway in Frisco, Texas. Ji Hun was accompanied by his sister, Su Min Kim ("Su Min"), who was riding in the front passenger seat of the CR-V. At the same time, Trae Michael Hubbard ("Hubbard") was driving northbound on Dallas Parkway in a 2009 Toyota Scion. When Hubbard reached the intersection of Warren Parkway and Dallas Parkway, he ran a red light and T-boned the passenger side of the Plaintiffs' CR-V.

Su Min, due to being positioned on the side of the CR-V that was struck by Hubbard's Scion, was the "near-side" occupant to the collision. However, Su Min did not suffer any "near-side" impact injuries. Rather, her injuries arose from "far-side" of the CR-V. When Hubbard struck the CR-V, the force of the collision caused Ji Hun's upper body to shift towards Su Min, resulting in a head-to-head contact between the two. As a result of this far-side impact, Su Min "sustained

severe, debilitating, and permanent injuries to her brain, skull, face, and left eye" (Dkt. #84 at p. 1). On May 7, 2019, Plaintiffs sued Defendant American Honda Motor Co., Inc. ("Honda"), asserting various theories of design defect premised on strict liability (Dkt. #36; Dkt. #65).[1] Plaintiffs alleged Su Min's injuries occurred because of a defective occupant restraint system that failed to restrain the far-side occupant's movement during the collision, thus creating an unreasonable risk of "far-side impact injuries" to the near-side passenger.

On May 17, 2022, the Court granted Honda's motion to designate Hubbard as a responsible third party pursuant to Texas Civil Practice and Remedies Code § 33.004 (Dkt. #72). The case then proceeded to trial, which began on June 6, 2022. On June 17, 2022, the jury returned its verdict (Dkt. #122). The jury found that there was a design defect in the 2014 Honda CR-V at the time it left the possession of Honda that was a producing cause of the injuries in question. The jury also found that the negligence of Hubbard was a proximate cause of the injuries in question. In apportioning fault between Hubbard and Honda, the jury found Honda twenty-three percent (23%) responsible and Hubbard seventy-seven percent (77%) responsible.

The jury awarded Su Min a total of $21,180,808.74 in damages, consisting of the following:

1. $180,808.74 for reasonable expenses of necessary medical care in the past;

2. $7,000,000.00 for reasonable expenses of necessary medical care that, in reasonable probability, Su Min will incur in the future;

3. $1,000,000.00 for loss of earning capacity that, in reasonable probability, Su Min will incur in the future;

---

[1] The Plaintiffs' Original Complaint brought claims of design defect premised in both strict liability and negligence (Dkt. #36). The Plaintiffs' Third Amended Complaint, however, dropped negligence as a theory of liability (Dkt. #65). Thus, the claim submitted to the jury at trial was for design defect based solely on strict liability.

4. $500,000.00 for physical impairment sustained in the past;

5. $2,000,000.00 for physical impairment that, in reasonable probability, Su Min will sustain in the future;

6. $4,000,000.00 for physical pain and suffering sustained in the past;

7. $2,000,000.00 for mental anguish sustained in the past;

8. $4,000,000.00 for mental anguish that, in reasonable probability, Su Min will sustain in the future; and

9. $500,000.00 for disfigurement sustained in the past.

The jury also awarded Ji Hun $250,000.00 in damages for bystander mental anguish sustained in the past.

On June 28, 2022, the Court entered final judgment in accordance with the jury's verdict (Dkt. #133). Pursuant to the jury's apportionment of fault between Honda and Hubbard,[2] the Court ordered that Su Min would recover from Honda $1,651,586.01 for actual damages sustained in the past along with pre- and post-judgment interest on that amount, and $3,220,000.00 for actual damages in the future along with post-judgment interest on that amount. The Court further ordered that Ji Hun would recover from Honda $57,500.00 for actual damages in the past along with pre- and post-judgment interest on that amount.

During trial, Honda moved for directed verdict, arguing that it was entitled to judgment as a matter of law on the Plaintiffs' strict products liability claim because there was no evidence: (1) that the CR-V was unreasonably dangerous; (2) that a safer alternative design existed; and

---

[2] *See* TEX. PRAC. & REM. CODE §§ 33.003(a) (requiring that the trier of fact determine the percentage of responsibility of each defendant and each responsible third party designed under § 33.004), 33.013(a) (mandating that a liable defendant is only liable for the percentage of damages found by the trier of fact equal to that defendant's percentage of responsibility), and 33.013(b) (stating a liable defendant is not jointly and severally liable for a claimant's damages unless the trier of fact determines the defendant's percentage of responsibility exceeds fifty percent).

(3) that any alleged defect in the 2014 Honda CR-V was a producing cause of the Plaintiffs' injuries (Dkt. #109). The Court orally denied the motion in full. On July 25, 2022, Honda filed the present renewed motion for judgment as a matter of law (Dkt. #138) and motion for new trial (Dkt. #139). On August 19, 2022, Plaintiffs filed responses to both motions (Dkt. #146; Dkt. #147). On September 8, 2022, Honda filed its replies (Dkt. #152; Dkt. #153).

## LEGAL STANDARDS

### I.  Judgment as a Matter of Law

After "a party has been fully heard on an issue during a jury trial," the court may "grant a motion for judgment as a matter of law against the party" so long as "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED. R. CIV. P. 50(a)(1). Upon a party's renewed motion for judgment as a matter of law following a jury verdict, the Court should properly ask whether "the state of proof is such that reasonable and impartial minds could reach the conclusion the jury expressed in its verdict." *Am. Home Assurance Co. v. United Space All.*, 378 F.3d 482, 487 (5th Cir. 2004); FED. R. CIV. P. 50(a). "A JMOL may only be granted when, 'viewing the evidence in the light most favorable to the verdict, the evidence points so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at any contrary conclusion.'" *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1261 (Fed. Cir. 2013) (quoting *Dresser-Rand Co. v. Virtual Automation, Inc.*, 361 F.3d 831, 838 (5th Cir. 2004)).

Fifth Circuit precedent requires a court be "especially deferential" to a jury's verdict. The court must not reverse the jury's findings unless substantial evidence does not support those findings. *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 499 (5th Cir. 2012). "Substantial evidence is defined as evidence of such quality and weight that reasonable and fair-minded men

in the exercise of impartial judgment might reach different conclusions." *Threlkeld v. Total Petroleum, Inc.*, 211 F.3d 887, 891 (5th Cir. 2000). A motion for judgment as a matter of law must be denied "unless the facts and inferences point so strongly and overwhelming in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Baisden*, 693 F.3d at 498 (citation omitted). However, "[t]here must be more than a mere scintilla of evidence in the record to prevent judgment as a matter of law in favor of the movant." *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 606 (5th Cir. 2007).

In evaluating a motion for judgment as a matter of law, a court "cannot substitute other inferences that [the court] might regard as more reasonable." *E.E.O.C. v. Boh Bros. Constr. Co.*, 731 F.3d 444, 451 (5th Cir. 2013) (citation omitted). Further, "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses.'" *Id.* at 151 (citation omitted).

## II.    Motion for New Trial

Under Rule 59(a) of the Federal Rules of Civil Procedure, a new trial can be granted to any party to a jury trial on any or all issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a). "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985). However, "[u]nless justice requires otherwise, no error in admitting or excluding evidence – or any other error by the court or a party—

is grounds for granting a new trial . . . At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights." FED. R. CIV. P. 61.

To be entitled to a new trial, the movant must show that the verdict was against the great weight of the evidence, not merely against the preponderance of the evidence. *Taylor v. Seton Healthcare*, No. A-10-CV-650, WL 2396880, at *2 (W.D. Tex. June 22, 2012) (citing *Dresser-Rand Co. v. Virtual Automation, Inc*., 361 F.3d 831, 838–39 (5th Cir. 2004); *Shows v. Jamison Bedding, Inc*., 671 F.2d 927, 930 (5th Cir. 1982)). A jury verdict is entitled to great deference. *Dresser-Rand Co*., 671 F.2d at 839. "Weighing the conflicting evidence and the inferences to be drawn from that evidence, and determining the relative credibility of the witnesses, are the province of the jury, and its decision must be accepted if the record contains any competent and substantial evidence tending fairly to support the verdict." *Gibraltar Savings v. LDBrinkman Corp*., 860 F.2d 1275, 1297 (5th Cir. 1988). Ultimately, the propriety of granting a motion for new trial is a matter left to the sound discretion of the trial court.

## ANALYSIS

Honda moves for judgment as a matter of law pursuant to Rule 50(a) and for a new trial pursuant to Rule 59(a) on the following issues: the jury's finding of Honda's liability on Plaintiffs' design defect claim; the jury's damages awards; and the applicability of the no-liability presumption found in Texas Civil Practice and Remedies Code § 82.008 (Dkt. #138; Dkt. #139). Honda additionally requests a new trial based on errors in the Court's charge, evidentiary rulings made before and during trial, and the Court's response to a note from the jury (Dkt. #139). The Court will address each argument in turn.

## I.   Sufficiency of the Evidence Supporting Honda's Liability

The jury found that at the time the CR-V left Honda's possession, it had a design defect

that was a producing cause of the injuries in question. Honda challenges the jury's finding that the CR-V had a design defect. Under Texas law, "to recover for a products liability claim alleging a design defect, a plaintiff must prove that (1) the product was defectively designed so as to render it unreasonably dangerous; (2) a safer alternative design existed; and (3) the defect was a producing cause of the injury for which the plaintiff seeks recovery." *Goodner v. Hyundai Motor Co., Ltd.*, 650 F.3d 1034, 1040 (5th Cir. 2011). In the present motions, Honda asserts that Plaintiffs failed to prove each of these elements.

### A. Whether the CR-V was Defectively Designed so as to Render it Unreasonably Dangerous

First, Honda argues that the evidence is insufficient to establish that the CR-V was defectively designed in a way that was unreasonably dangerous (Dkt. #138 at p. 6). Whether a product is "unreasonably dangerous" is generally a question of fact for the jury. *Brochtrup v. Mercury Marine*, 426 F. App'x 335, 337 (5th Cir. 2011); *Goodner*, 650 F.3d at 1040. Whether a design defect renders a product unreasonably dangerous depends on whether the product's risk outweighs its utility, considering:

> (1) the utility of the product to the user and to the public as a whole weighed against the gravity and likelihood of injury from its use; (2) the availability of a substitute product which would meet the same need and not be unsafe or unreasonably expensive; (3) the manufacturer's ability to eliminate the unsafe character of the product without seriously impairing its usefulness or significantly increasing its costs; (4) the user's anticipated awareness of the dangers inherent in the product and their avoidability because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions; and (5) the expectations of the ordinary consumer.

*Genie Indus v. Matak*, 462 S.W.3d 1, 9–10 (Tex. 2015) (quoting *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 311 (Tex. 2009)). While evidence of these five factors may be presented to the jury, "the factors themselves are not set out as a definitional requirement of a design defect claim." *Goodner*, 650 F.3d at 1040. Further, "the five factors are evaluated holistically; no single factor

needs to be proven on its own, so long as all factors working together point to a finding of unreasonable dangerousness." *Id.* at 1041.

After reviewing all of the evidence, the Court concludes that sufficient evidence exists to support the jury's finding. Plaintiffs' automotive engineering expert, Neil Hannemann ("Hannemann"), testified about the risks of the design of the CR-V's safety restraint system. While he agreed the design was sufficient to protect against near-side injuries, he opined that the restraint system failed to provide any protection to the near-side occupant against far-side injuries. Specifically, he explained that when the CR-V is struck from the side, the vehicle's restraint system had no way to prevent head-to-head contact between the front-row occupants. Hannemann then testified that because of these deficiencies, there was no mechanism in place to prevent Ji Hun's heads from striking Su Min's head. He concluded that the risk of this contact occurring outweighed the general utility of the CR-V's safety restraint system.

Plaintiffs' mechanical engineering and accident reconstruction expert, Dr. Mariusz Ziejewski ("Ziejewski"), agreed with Hannemann's conclusions and expanded on the defective nature of the CR-V's design. Ziejewski began by explaining the general principles used to assess how the dynamics of an occupant's body and the structure of a vehicle impact how the vehicle responds to a collision and the likelihood of occupant injury. He then explained that when the CR-V is struck on the passenger-side, the design of the vehicle's safety restraint system has no mechanism to prevent the movement of the driver into the passenger compartment, and provides no cushion to minimize injury in the event of head-to-head contact between the occupants. Specific to Plaintiffs' collision, he explained that the CR-V's seat belts allowed Ji Hun's shoulder to roll out of the seat belt, which in turn allowed Ji Hun's torso to move into the passenger compartment, resulting in Ji Hun's head striking Su Min's head. Ziejewski performed a live demonstration using

seats out of a 2009 Chrysler Sebring to show how easily a driver can slip out of the type of seatbelt used in the CR-V when the vehicle is struck on its passenger-side.

In addition, Ziejewski opined that in side-impact collisions, the CR-V's safety restraint system was only designed to protect the passenger from near-side injuries—i.e., injuries to the passenger caused by the other vehicle's contact with the passenger-side of the CR-V. He further stated that the CR-V's seat belts and air bag placements were not designed to protect the passenger from far-side injuries—i.e., injuries to the passenger caused by an impact with the driver inside the same vehicle. In fact, based on the tests Honda performed when designing the CR-V, Ziejewski found that nothing in the vehicle's design accounted for this risk of far-side injury to the front-seat passenger. He concluded that because it is impossible for a driver like Ji Hun to brace themselves or control their own movement in this type of collision, the vehicle's design must account for this risk of far-side injury to the passenger. Because the CR-V was not designed with any mechanism to address this risk, he contended that the vehicle was unreasonably dangerous as designed. Additionally, and as explained in detail in the following sections, the evidence relied on by Plaintiffs' experts showed that the design of the CR-V could have been modified to minimize the risk of far-side injury to Su Min without seriously impacting the utility the vehicle.

Predictably, Honda's experts generally disagreed with the opinions of Hannemann and Ziejewski. For example, Honda's engineering expert, Michael Klima ("Klima"), testified that the chance of Su Min's injury occurring is very low, and that no amount of modification to the CR-V's design would have prevented Su Min's injuries. Based on this, Klima opined that the design of the CR-V was not unreasonably dangerous. Honda's biomechanical engineering expert, Michael Carhart ("Carhart"), agreed with this conclusion, and conducted a sled test to support his findings. Klima and Carhart, along with Honda's accident reconstruction expert, Dr. Gregory

Stephens ("Stephens"), analyzed the opinions of Hannemann and Ziejewski, and pointed out areas they believed to be flawed. Compared to the testimony of its own experts, Honda argues that the opinions of Hannemann and Ziejewski were so conclusory that they cannot be used to support the jury's verdict.

Contrary to Honda's arguments, the evidence put forth at trial was sufficient to allow a reasonable jury to conclude that the design of the CR-V was unreasonably dangerous. While Honda may disagree with the conclusions of Plaintiffs' experts, Hannemann and Ziejewski offered more than just conclusory allegations. Their opinions that the design of the CR-V is defective was not, for example, founded on "the mere fact that an accident or injury occurred." *Arant v. Wal-Mart Stores, Inc.*, 628 F. App'x 237, 239 (5th Cir. 2015). Rather, as discussed *infra*, their conclusions were based on scientific calculations, peer-reviewed articles, demonstrations, and their general experience and understanding of relevant engineering concepts.

Moreover, Honda exercised its right at trial to offer expert testimony and evidence of its own to contradict the opinions of Plaintiffs' experts. Simply because Honda believes its position is the only correct one is not a reason to overturn the jury's verdict. *See generally Boh Bros. Constr.*, 731 F.3d at 451 (stating a verdict may not be overturned based on the belief that the losing party's evidence was more reasonable). Instead, it was up to the jury to decide whose evidence to believe. "The jury was, of course, entitled to accept that testimony which it found to be the most relevant and believable and to reject testimony to the contrary, including that of the expert witnesses." *Hopkins*, 535 S.W.2d at 886; *see also Reeves*, 530 U.S. at 150 ("Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."). Thus, the jury was entitled to believe the testimony of Plaintiffs' expert witnesses who testified that the CR-V was defective because it was unreasonably

dangerous as designed. The Court finds that such a finding is supported by substantial evidence in record. Accordingly, Honda is not entitled to judgment as a matter of law or a new trial on this basis. *Baisden*, 693 F.3d 491, 499 (5th Cir. 2012).

### B.  Whether a Safer Alternative Design Existed

Next, Honda argues that Plaintiffs failed to prove the existence of a safer alternative design. A "safer alternative design" means a product design other than the one actually used that in reasonable probability:

> (1)  would have prevented or significantly reduced the risk of the claimant's personal injury, property damage, or death without substantially impairing the product's utility; and
> (2)  was economically and technologically feasible at the time the product left the control of the manufacturer or seller by the application of existing or reasonably achievable scientific knowledge.

TEX. CIV. PRAC. & REM. CODE § 82.005(b). Plaintiffs proposed two alternative designs to the CR-V's existing safety restraint system: reverse geometry seatbelts and a center airbag. As an initial matter, and as discussed *infra*, Honda did not contest the feasibility of either of these alternative designs. However, because Honda refused to stipulate to feasibility, the Plaintiffs were still required to introduce sufficient evidence of feasibility at trial. Plaintiffs satisfied this burden.

The Honda CR-V at issue was manufactured in 2014. In regards to the center airbag, Hannemann opined that there would be no issue with installing the airbag in the CR-V. He testified that the design was first used in 2013 when General Motors incorporated it into three of their vehicles. Honda's expert Klima admitted to this fact on cross-examination. Hannemann further explained that adding a center airbag would only cost twenty to thirty dollars per vehicle, which would not substantially impact the cost to design or manufacture the CR-V. Regarding the reverse geometry seatbelt, Hannemann testified that the design was first tested in the late 1970s and 1980s. He pointed to a late 1990s vehicle manufactured by BMW that incorporated reverse geometry

seatbelts in the front row of the vehicle, as well as an example of a vehicle that used the design in its rear seats before 2014. Similar to the center airbag design, Hannemann stated that adding reverse geometry seatbelts would only increase the cost of each vehicle by twenty-eight to thirty dollars.

Thus, the jury was presented with sufficient evidence to conclude that both the center airbag design and the reverse geometry seatbelt design were technologically and economically feasible at the time the CR-V was manufactured. The Court will now address whether there was sufficient evidence of the risks and utility of these designs.

### 1. Whether a Center Airbag Would Have Prevented or Significantly Reduced the Risk of Plaintiffs' Injuries Without Substantially Impairing the CR-V's Utility

Honda contends there is no evidence that a center airbag would have reduced the risk of the injuries in this case. Specifically, Honda first contends that Hannemann and Ziejewski have no basis for their opinions regarding the safety of their proposed center airbag design because neither expert performed a risk-utility analysis on the design.

"In evaluating the reliability of an expert's opinions on product design alternatives, the Fifth Circuit has looked to whether the expert produced drawings, performed calculations, or tested the alternative design." *Nester v. Textron, Inc.*, No. 1:13-CV-920, 2015 WL 7272249, at *8 (W.D. Tex. Nov. 17, 2015), *aff'd* 888 F.3d 151 (2018), (citing *Watkins v. Telesmith, Inc.*, 121 F.3d 984, 992 (5th Cir. 1997)). The plaintiff must show "the safety benefits from [the] proposed design are foreseeably greater than the resulting costs, including any diminished usefulness or diminished safety." *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 337 (Tex. 1998).

Here, Hannemann's testimony sufficiently addressed the relevant risks of the proposed center airbag design and its impact on utility. He began with a general discussion of the design and

its intended use. He explained that a center airbag can be placed within the side lining of either the driver or passenger seat in the front row of the vehicle. When the vehicle is struck on its side, the center airbag can deploy within milliseconds and creates a cushion in the space between the driver's seat and the passenger's seat which, according to Hannemann, protects against head-to-head contact. To support his opinion, Hannemann relied on several demonstrative aides, scientific articles, research conducted by other manufacturers, patents, and his knowledge of general engineering principles. He noted how the design could be installed without impairing the vehicle's existing safety restraint system. He then discussed and showed the jury a set of pole impact tests performed by General Motors to show the mechanics behind how a center airbag can prevent head-to-head contact. He presented the jury with research from several technical papers, including from the Society of Engineers, that found center airbags increased safety in both roll-overs and side-impacts. Based on his experience and the research he conducted, Hannemann concluded that a center airbag would have reduced or prevented the injuries Su Min sustained from head-to-head contact with Ji Hun in the accident.

Ziejewski similarly discussed the benefits of a center airbag. He walked the jury through several crash dummy examples and peer-reviewed articles discussing the design and benefit of a center airbag. He used other visual tools like graphs to explain how the mechanics and speed of the vehicles involved in the collision could impact the occupants' injuries, and, just like Hannemann, concluded that a center airbag would mitigate the risk and severity of injury to the passenger from head-to-head contact with the driver, including in the Plaintiffs' accident.

Further, on cross-examination, Honda questioned Hannemann about the increased risk of inflation-induced injuries from the addition of a center airbag. Hannemann noted that he considered the issue, but explained that advances in technology have greatly-reduced the

likelihood of this injury occurring, so he did not consider inflation-induced injuries to be a significant concern. He again cited to research performed by General Motors which found the rate of inflation-induced injuries from center airbags to be within acceptable limits. In sum, based on his experience and the material he reviewed, Hannemann concluded that the center airbag design would prevent or minimize head-to-head contact without introducing significant risks of additional injury into the vehicle. Thus, contrary to Honda's assertion, Plaintiffs' experts sufficiently performed a risk-utility analysis of the center airbag design. *Cf. Smith v. Louisville Ladder Co*., 237 F.3d 515, 519–20 (5th Cir. 2001) (reversing verdict where plaintiff's expert offered only a "preliminary concept" as an alternative design, which was not market-ready, and may be "awkward," and did not consider whether his design had any safety issues or additional hazards of its own).

Next, Honda contends that neither Hannemann nor Ziejewski conducted any testing of their own to prove that a center airbag would have prevented the injuries that occurred in this case. However, an expert is not required to do his own testing of a proposed alternative design. *Sims v. Kia Motors of Am., Inc.,* 839 F.3d 393, 406 (5th Cir. 2016) (citing *Goodner*, 650 F.3d at 1043–44). It is true that "Texas law expects that an alternative design be tested before a jury can reasonably conclude that the alternative would prevent or reduce the risk of injury." *Casey v. Toyota Motor Eng'g & Mfg. N. Am., Inc.,* 770 F.3d 322, 332 (5th Cir. 2014). But, "this testing need not entail actually constructing a model[,] . . . testing can be as simple as applying math and physics to establish the viability of a design," or analyzing the use of the design by others in the industry. *Sims,* 839 F.3d at 406, 407; *see also Gen. Motors Corp. v. Sanchez,* 997 S.W.2d 584, 592 (Tex. 1999) (holding expert testimony that is reasonably supported suffices, even where the expert has produced no prototype). Further, an expert's "[f]ailure to conduct testing of the alternative

design goes to the weight that should be afforded to [the expert's] opinions, but is not fatal to [the plaintiff's] prima facie case." *A.K.W. v. Easton-Bell Sports, Inc.*, 454 F. App'x 244, 248 n.1 (5th Cir. 2011) (citing *Watkins*, 121 F.3d at 992 ("This is not to say that alternative product designs must always be tested by a plaintiff's expert.")).

Honda is correct that neither expert conducted their own testing for this case. However, their opinions were founded on much more than "mere speculation." *Hodges v. Mack Trucks*, 474 F.3d 188, 196 (5th Cir. 2006). As stated above, both Hannemann and Ziejewski reviewed peer-reviewed articles in the area, examined the use of the design by others in the industry, and explained the mechanics and scientific principles of the design, relying on the aid of demonstratives and animations as needed. Further, both experts considered testing that others had performed. Hannemann considered testing performed by General Motors and other engineers in the literature he relied on which showed that a center airbag reduced the risk of head-to-head contact between the driver and passenger. Further, Ziejewski considered the sled tests Carhart performed for this case and explained why Carhart's tests did not accurately show how a center airbag would have benefitted Plaintiffs' during the accident.

Thus, despite not conducting any independent testing, Plaintiffs' experts did evaluate and analyze the center airbag design, and provided ample scientific support for their conclusions. *Cf. Casey*, 770 F.3d 322 (affirming district court's grant of judgment as a matter of law in favor of defendants where plaintiff's expert conducted no testing, analysis, or evaluation of the alternative designs, *and* presented no evidence that the designs were workable or feasible). The Court finds, therefore, that the record contains sufficient evidence that would a allow a reasonable juror to conclude that a center airbag would have prevented or significantly reduced the risk of Plaintiffs' injuries in this case without substantially impairing the CR-V's utility. Accordingly, Honda is not

entitled to judgment as a matter of law or a new trial on this basis.

### 2. Whether Reverse Geometry Seatbelts Would Have Prevented or Significantly Reduced the Risk of Plaintiffs' Injuries Without Substantially Impairing the CR-V's Utility

Just like its attack on the sufficiency of the evidence supporting a center airbag design, Honda contends that Plaintiffs presented no evidence that reverse geometry seatbelts would have reduced the risk of the injuries in this case. Honda again argues that Hannemann and Ziejewski failed to conduct a risk-utility analysis of the reverse geometry seatbelt design. Further, Honda contends that the evidence clearly shows the design creates additional risks, including neck injuries and a general decline in the public's seatbelt usage due to unfamiliarity with the design. The Court disagrees.

Hannemann and Ziejewski discussed in detail the purpose and engineering behind reverse geometry seatbelts. In a collision to the passenger-side of the vehicle like in this case, Ziejewski testified that the reverse design would prevent the driver from slipping out of position and moving into the passenger compartment, thus minimizing the risk of head-to-head contact. Ziejewski also used a set of seats removed from a 2009 Chrysler Sebring as well as an animation to demonstrate to the jury what reverse geometry seatbelts looked like and how they were designed to operate. While neither expert performed independent testing for this accident, they both explained why they believed reverse geometry seatbelts were a safer option than the three-point seatbelt used in the CR-V, citing to various literature and research findings in support. Ziejewski again discussed the sled tests Carhart performed, and explained why the tests did not present an accurate analysis of the benefits from reverse geometry seatbelts. Ultimately, both Hannemann and Ziejewski concluded that a reverse geometry seatbelt would have prevented or minimized the risk of Ji Hun's torso from moving towards the passenger compartment during the collision, and thus would have

significantly reduced the risk of injury from head-to-head contact with Su Min.

Furthermore, Honda's recollection of Hannemann's testimony related to the reverse geometry seatbelt design is inaccurate. To start, Hannemann did consider the risks of the design, including whether the design could potentially result in additional neck injuries. However, he then discussed—in depth—the history and evolution of seat belt designs. Based on advancements in technology, he opined that reverse geometry seatbelts posed little to no risk of additional injuries because any risk would be offset by safety features already in place in the CR-V. For example, he stated that load limiters—a device used to control a seatbelt's tension in the event of a crash— eliminated any risk of neck injuries created by reverse geometry seatbelts. He pointed out that the research Honda relied on to prove the increased risk of neck injuries was from the 1970s and 1980s, before load limiters were developed. But by 2014, load limiters were fully incorporated into the standard vehicle seatbelt design. Based on this data, Hannemann concluded that reverse geometry seatbelts could have easily been designed in 2014 and installed in the CR-V in a way that would eliminate any risk of neck injury.

Hannemann further testified that he considered the risk of an occupant rolling out of a reverse geometry seatbelt during a near-side impact collision, but concluded that the CR-V's door and side curtain airbag were adequately designed to guard against this risk. Finally, Hannemann explained that he did not consider non-usage due to unfamiliarity to be an identified risk with reverse geometry seatbelts because the design had the same ergonomics as a standard three-point seatbelt. In support, he pointed to a study from General Motors which considered and dismissed this as a potential risk of the design. Thus, contrary to Honda's allegations, Hannemann did adequately address the different risks of the reverse geometry seatbelt design.

In sum, there was sufficient evidence in the record that would allow a reasonable juror to

conclude that a center airbag would have prevented or significantly reduced the risk of Plaintiffs' injuries in this case without substantially impairing the CR-V's utility. Accordingly, Honda is not entitled to judgment as a matter of law or a new trial on this basis.

### C. Whether the CR-V's Defective Design was a Producing Cause of the Injuries for Which the Plaintiffs' Seek Recovery

Finally, Honda contends that there is no evidence any alleged defect in the CR-V's design was the producing cause of the Plaintiffs' injuries. The last element a plaintiff must prove to prevail on a design defect claim is that the alleged defect was "a producing cause of the personal injury, property damage, or death for which the claimant seeks recovery." TEX. CIV. PRAC. & REM. CODE § 82.005(b). Under Texas law, a producing cause is defined as one that is "a substantial factor in bringing about an injury, and without which the injury would not have occurred." *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 46 (Tex. 2007). While "proof of causation requires more than conjecture and guess," causation need not be supported by direct evidence. *Goodner*, 650 F.3d at 1044 (citations omitted). Indeed, "[c]ircumstantial evidence and reasonable inferences therefrom are a sufficient basis for a finding of causation." *Id.* (quotations omitted).

The parties agree that Su Min was injured when she made head-to-head contact with Ji Hun. Dr. Richard Cowles ("Dr. Cowles"), a clinical psychologist and cognitive neuropsychologist, also confirmed that Su Min's injuries were the result of blunt force trauma contact to the left side of her skull. However, the parties disputed why this injury happened. From the perspective of Honda's experts, no modification to the design of the CR-V would have prevented the head-to-head contact. In other words, Honda's position at trial was that the contact which resulted in Su Min's injuries was caused by the collision itself, not any defect in the CR-V's design. Conversely, Plaintiffs' experts presented evidence that the CR-V's defective design was a producing cause of Su Min's injuries. Ziejewski and Hannemann opined that the head-to-head contact occurred

18

because the CR-V's design did not adequately restrain the far-side movement of the driver, Ji Hun. Due to this lack of adequate restraint, they assert that Ji Hun's torso was able to move into the passenger compartment which caused the head-to-head contact with Su Min.

To support this conclusion, Hannemann performed an independent analysis to confirm his opinion on the cause of Su Min's injuries. He reviewed the manner and extent by which Hubbard's Scion intruded into the CR-V, and found that the force of the impact was absorbed by the frame and body of the CR-V. From this, he explained that Su Min did not suffer any near-side injuries because none of the crush energy of the collision was transferred to Su Min. Rather, her injuries came from inside the vehicle when her head was struck by Ji Hun's head. Further, Ziejewski reviewed the depositions of the paramedics and attending officers, the radiology reports and imaging of Su Min's skull after the accident, the CR-V's pre-crash data, and diagrams of the accident scene drawn by the attending police officers. He also inspected the Plaintiffs' CR-V and took photos and measurements of Ji Hun and Su Min sitting in the vehicle, and did the same using an exemplar. He specifically inspected the seatbelts Plaintiffs were wearing in the CR-V by taking a measuring tape to mark where the latch plate went through the webbing. He found no indication that either Ji Hun or Su Min was wearing their seatbelt incorrectly. He then used this analysis to confirm that the three-point seatbelt used in the CR-V was the reason Ji Hun's movement was not properly restricted to the driver compartment when the CR-V was struck by Hubbard's Scion.

Thus, the jury was presented with conflicting evidence on the cause of Su Min's injuries. The jury weighed this evidence, and ultimately found that a defect in the CR-V's design was a producing cause of the injuries in question. The Court finds that the jury was presented with competent and substantial evidence to support this finding. Accordingly, Honda is not entitled to judgment as a matter of law or a new trial on this basis.

## II.     Sufficiency of the Evidence Supporting the Damages Awards

Next, Honda argues that the evidence does not support several of the damages amounts the jury awarded to Su Min and Ji Hun. "The law governing what damages are recoverable is substantive, and therefore in a diversity case state law governs what damages are available for a given claim and the manner in which those damages must be proved." *Homoki v. Conversion Servs*., 717 F.3d 388, 398 (5th Cir. 2013) (citing *Coursey v. Broadhurst*, 888 F.2d 338, 344 (5th Cir. 1989) (per curiam)); *see also Gasperini v. Ctr. for Humanities, Inc*., 518 U.S. 415, 418 (1996) (holding state law governs "the size of jury verdicts" in diversity cases). Under Texas law, a jury "generally has discretion to award damages within the range of evidence presented at trial." *Matter of Mandel*, 720 F. App'x 186, 192 (5th Cir. 2018). Thus, for a sufficiency review of an award of damages, "[t]he question boils down to whether the evidence introduced at trial would allow a reasonable, fair-minded jury to come to the verdict the actual jury reached." *Longoria v. Hunter Express, Ltd*., 932 F.3d 360, 365 (5th Cir. 2019) (citing *Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 159–60 (Tex. 2014)).

Generally, "[t]here is a strong presumption in favor of affirming a jury award of damages." *Giles v. Gen. Elec. Co*., 245 F.3d 474, 488 (5th Cir. 2001) (quoting *Eiland v. Westinghouse Elec. Corp*., 58 F.3d 176, 183 (5th Cir. 1995)). Pursuant to this presumption, "all reasonable efforts should be made to uphold [the jury's] verdict." *Evans v. H.C. Watkins Mem. Hosp., Inc.*, 778 F.2d 1021, 1022 (5th Cir. 1985) (citation omitted). The presumption is overcome only when "the jury's damage award is 'so factually insufficient or so against the great weight and preponderance of the evidence as to be manifestly unjust.'" *Longoria*, 932 F.3d at 365 (citing *Pope v. Moore*, 711 S.W.2d 622, 624 (Tex. 1986)). But so long as "sufficient probative evidence exists to support the jury's verdict, neither the reviewing court nor the trial court is entitled to substitute its judgment

for that of the jury." *Gen. Motors Corp. v. Burry*, 203 S.W.3d 514, 552 (Tex. App.—Fort Worth 2006, pet. denied) (citations omitted).

### A.  Su Min's Damages

Honda challenges the amounts the jury awarded to Su Min for the following categories of damages: (1) future medical care expenses; (2) future loss of earning capacity; (3) past and future physical impairment; (4) past and future mental anguish; and (5) past disfigurement. The Court will address each award below.

### 1.  Future Medical Care Expenses

Honda argues that Plaintiffs failed to present any evidence to support the jury's award for Su Min's future medical care expenses (Dkt. #138 at p. 19). "In Texas, the award of future medical expenses is not an element of damages that must be supported with precise evidence, since it is a matter upon which the jury may make its award based upon the nature of the injuries, the medical care rendered before the trial, and the condition of the injured party." *Johnson v. Michelin Tire Corp.*, 812 F.2d 200, 210 (5th Cir. 1987). Instead, Texas follows the "reasonable-probability rule." *Werner Co. v. Devallee*, No. 02-19-0043-CV, 2021 WL 1134387, at *8 (Tex. App.—Fort Worth Mar. 25, 2021, pet. filed) (citing *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 654 (Tex. 1999)). Under this rule, "the plaintiff must present evidence to establish that in all reasonable probability (1) medical expenses will be incurred in the future, and (2) what the reasonable cost of that care will be." *Rodriguez v. Larson*, 259 F. App'x 607, 609–10 (5th Cir. 2007); *see also Pusteojovsky v. Rapid-Am. Corp.*, 35 S.W.3d 643, 652 (Tex. 2000) (noting that reasonable medical probability is generally understood to mean greater than fifty percent).

The reasonable value of future medical care may be established by evidence such as the cost of past medical treatment. *Rosenboom Machine & Tool, Inc. v. Machala*, 995 S.W.2d 817,

828 (Tex. App.—Houston [1st Dist.] 1999, pet. denied); *Rodriguez*, 250 F. App'x at 609. However, "[n]o precise evidence is required" to obtain an award for future medical expenses. *City of San Antonio v. Vela*, 762 S.W.2d 314, 321 (Tex. App.—San Antonio 1988, writ denied). Rather, "[t]he jury may make its award based upon the nature of the injuries, the medical care rendered before trial, and the condition of the injured party at the time of trial." *Id.*

Here, the evidence introduced at trial was sufficient for a jury to find that there is a reasonable probability Su Min will need medical care in the future, as well as the anticipated cost of this care. Dr. Erin Bigler ("Dr. Bigler"), a neuropsychologist specializing in cognitive rehabilitation treatments for patients that have sustained a traumatic brain injury, testified about the extent and impact of Su Min's injuries. Dr. Bigler evaluated Su Min, and explained that Su Min suffered severe and irreversible damage to her skull, brain, and face as a result of the injuries she sustained in the collision. Dr. Bigler then explained that Su Min's injuries left her with post-traumatic epilepsy, which requires constant monitoring due to the structural changes in Su Min's brain. Su Min's mother ("Mrs. Kim") and father ("Mr. Kim"), who have cared for Su Min daily since the accident occurred, testified that Su Min is required to take seizure medication on a daily basis, along with blood thinners, thyroid medication, and hormone pills. They stated that she will continue to need these medications for the foreseeable future. Additionally, Mr. Kim discussed how Su Min has benefitted from specialized medical care and rehabilitative treatments in Korea, and stated that he intends for Su Min to continue receiving these same treatments in the future.

The jury also heard from Dr. Aaron Wolfson ("Dr. Wolfson"), a life care planner and vocational expert. He provided data on Su Min's expected future medical expenses based on his clinical interviews, a review of Su Min's medical records, and a consultation with Dr. Bigler. Dr. Wolfson opined that Su Min will likely need the following medical care services for the

remainder of her life as a result of the traumatic injury to her brain: routine care and periodic evaluations from specialized neurologists and psychiatrists; cognitive and physical therapies; diagnostic and surgical procedures; medications, equipment, and supplies; and home heath care. He estimated the average cost of each category before concluding that Su Min's overall future medical expenses would exceed $11,000,000.

Ultimately, the jury awarded Su Min $7,000,000 for her future medical care expenses. After a review of the record, the Court finds that substantial evidence was introduced at trial was sufficient to support this finding. Accordingly, Honda is not entitled to judgment as a matter of law or a new trial on this basis.

### 2.  Future Loss of Earning Capacity

Honda argues that any evidence of Su Min's future lost earning capacity was "highly speculative" and insufficient to support the jury's award (Dkt. #138 at p. 19). "'Lost earning capacity' is an assessment of the plaintiff's capacity to earn a livelihood prior to injury and the extent to which the injury impaired that capacity." *Huston v. U.P.S., Inc.*, 434 S.W.3d 630, 640 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (citation omitted). "An award of damages for loss of future earning capacity can be based on a number of factors: '(1) past earnings; (2) the plaintiff's stamina, efficiency, and ability to work with pain; (3) the weakness and degenerative changes that will naturally result from the plaintiff's injury; and (4) the plaintiff's work-life expectancy." *Holcombe v. United States*, No. SA-18-CV-00555, 2022 WL 354974, at *2 (W.D. Tex. Feb. 7, 2022) (quoting *Virlar v. Puente*, 613 S.W.3d 652, 682 (Tex. App.—San Antonio 2020, pet. filed), and *Perez v. Arredondo*, 452 S.W.3d 847, 862 (Tex. App.—San Antonio 2014, no pet.)).

Loss of earning capacity is inherently a highly fact-specific inquiry, and the degree of

certainty to which a plaintiff can establish their lost earning capacity will necessarily vary by case. *Strauss v. Cont'l Airlines, Inc.*, 67 S.W.3d 428, 436 (Tex. App.—Houston [14th Dist.] 2002, no pet.). Further, while evidence of past earnings may be some indication of a plaintiff's future earning capacity, "it is not the only evidence in an inquiry that looks many years or decades into a person's future." *W&T Offshore, Inc. v. Fredieu*, 610 S.W.3d 884, 889 (Tex. 2020). Consequently, a plaintiff who, due to age or other circumstances, never earned any money in the past, may still recover damages for loss of earning capacity. *See Pilgrim's Pride Corp. v. Smoak*, 134 S.W.3d 880, 900 (Tex. App.—Texarkana 2004, pet. denied) ("Loss of earning capacity is not measured by what a person actually earned before an injury, but by what the [person's] capacity to earn a livelihood actually was, even if he or she had never worked in that capacity in the past."); *El Paso Elec. Ry. Co. v. Murphy*, 109 S.W. 489, 490 (Tex. Civ. App. 1908, writ ref'd) ("It must be observed that the matter to be determined is not what he actually earned before his injury . . . . For whatever capacity he had for earning money before the injury, whether he exercised it or not, was his, and he was entitled to it unimpaired by injury wrongfully inflicted by another."). In such a case, "the jury must determine the value of the [plaintiff's] lost earning capacity from their 'common knowledge and sense of justice.'" *Strauss*, 67 S.W.3d at 436 (quoting *McIver v. Gloria*, 169 S.W.2d 710, 712 (Tex. 1943)). Thus, ultimately, "[t]he amount of damages resulting from impairment of a plaintiff's earning capacity must be left largely to the sound judgment and discretion of the jury." *Johnson v. Michelin Tire Corp.*, 812 F.2d 200, 209 (5th Cir. 1987) (applying *Bonney v. San Antonio Transit Co.*, 325 S.W.2d 117 (Tex. 1959)).

Plaintiffs assert that the evidence introduced at trial shows that Su Min desired to be a professional musician, music teacher, or pharmacist in the future. In contrast, Honda argues that the evidence failed to show that Su Min's abilities before the accident would have allowed her to

become a professional musician because even at that time, her violin skills were "average to below average" (Dkt. #138 at p. 19). Honda further asserts that the evidence shows Su Min developed the aspiration to become a pharmacist post-accident, and contends this cannot be used to calculate her lost earning capacity. The Court disagrees with Honda's interpretation of the evidence.

Prior to the accident, Su Min was a student at the University of Texas where she studied violin. The jury was read a letter from Su Min that she wrote when applying to the university's music program wherein she expressed her interest in pursuing a career in the music industry. The jury also watched a video of Su Min's violin skills before the accident. When questioned about how the accident impacted her ability to play violin, Su Min expressed that her skills are nowhere near the level they were previously.

This testimony was corroborated by William Fedkenheuer ("Fedkenheuer"), Su Min's undergraduate violin professor for the fall semester of 2017 and spring semester of 2018. He discussed Su Min's entry into the university's music program, which he described as one of the top music schools in Texas with a music program renowned across the industry. Even in this competitive program, Fedkenheuer testified that before the accident, Su Min's violin skills were strong enough to place her around the middle tier of her class. Fedkenheuer also stated Su Min spoke with him about potential career paths. Along with her interest in the musical field, she showed interest in a career in the medical field, including pharmacy and nursing.

Fedkenheuer then spoke about Su Min's musical abilities after the accident. He stated that her ability to physically adjust to playing the violin and her quality of sound have dropped to a very low level. Despite Su Min's continued efforts, he admitted that her violin skills have plateaued, and she has reached the limit of what is really possible for her to do on her own. Pointedly, he testified that her post-accident violin skill level would not get her admitted into the

university's music program. In fact, he stated that it would be hard to find any program that would take her in.

The jury also heard from Dr. Cowles who reviewed images taken of Su Min's brain after the collision, then performed a neurological evaluation of Su Min to assess her overall cognitive function. His evaluation included several different types of tests, including memory, comprehension, retention, expression, and motor planning capabilities. Based on her level of education, upbringing, and family history, Dr. Cowles predicted Su Min's pre-accident IQ to be somewhere around 105. However, the results of his testing indicated that Su Min had an IQ after the accident of only 75. Additionally, her overall intellectual functioning skills were dramatically low across the board. For example, Su Min was instructed to listen to a short story. However, when asked to recite the story back to Dr. Cowles, her ability to do so was at less than one percent. Along with her auditory memory skills, Su Min's logical memory, visual memory, attention and comprehension, verbal fluency, and verbal and written expression skills all scored in the low range. Dr. Cowles further found that Su Min had difficulties with motor planning, such as describing how she brushed her teeth. As for her physical capabilities, Dr. Cowles noted that Su Min exhibited low grip strength and loss of dexterity in her right hand. Based on the permanent nature of her brain injury, Dr. Cowles stated it would be irresponsible to tell Su Min or her family that Su Min would show much improvement in any of these areas in the future. Mr. Kim agreed with this, admitting that he has no hopes for Su Min's future because of the physical and mental limitations she now has.

Finally, the jury heard from Dr. Bradley Ewing ("Dr. Ewing"), an economist who explained to the jury how to place a numerical value on Su Min's loss of earning capacity. Dr. Ewing first explained that because Su Min was so young when the accident happened, she had no prior

earnings history. Rather, her estimated lost earnings were based on Dr. Wolfson's findings on her skill levels and future medical needs. Based on this information, Dr. Ewing concluded that Su Min's life expectancy is just over fifty-nine years of age. He then discussed her future lost earnings for two occupations—a pharmacist and a music teacher. His assessment of her lost earnings in these occupations was based on a full loss model that assumed Su Min would never be able to work or earn any sort of income. Dr. Ewing stated that for her expected life range, her potential loss in earnings as a music teacher was $1,403,667, and about double that as a pharmacist.[3]

In sum, the evidence presented at trial indicated that as a result of Su Min's injuries, she now lacks the general skills she previously possessed that are needed to obtain and maintain employment as a music teacher or a pharmacist. Based on this evidence, the jury ultimately awarded Su Min $1,000,000 for her future loss in earning capacity. After a review of the record, the Court finds that substantial evidence was introduced at trial to support this finding. Accordingly, Honda is not entitled to judgment as a matter of law or a new trial on this basis.

### 3.  Past and Future Physical Impairment

Next, Honda argues that the amounts awarded to Su Min for physical impairment sustained in the past and future are unsupported by the evidence. "Physical impairment, sometimes called loss of enjoyment of life, encompasses the loss of the injured party's former lifestyle." *Burry*, 203

---

[3] As noted, Honda argues that it is entitled to judgment as a matter of law or a new trial because the evidence at trial showed Su Min only expressed an interest in becoming a pharmacist after the accident occurred. The Court is not persuaded by this argument. First, the evidence did not conclusively show when Su Min first expressed interest in becoming a pharmacist. For example, Fedkenheuer did not specify whether his conversations with Su Min about her interest in pharmacy occurred before or after the accident, and Dr. Ewing similarly stated that he had no idea if she only became interested in pharmacy after the accident. Thus, this was a matter for the jury to decide using their best judgment. *See Lanier v. E. Founds., Inc.*, 401 S.W.3d 455, 455 (Tex. App.—Dallas 2013, no pet.) (stating it is the jury's role "to determine which witnesses to believe or disbelieve and resolve any conflicts or inconsistencies in the evidence."). Regardless, the evidence would support the damages award even if pharmacy was not presented as a potential career path for Su Min. As discussed above, Dr. Ewing's estimate for Su Min's lost future earnings as a music teacher was $1,403,667. Thus, the evidence would support the jury's $1,000,000 award based solely on Su Min's lost capacity as a music teacher, which Honda does not dispute her desire to pursue.

S.W.3d at 547 (citing *Dawson v. Briggs*, 107 S.W.3d 739, 752 (Tex. App.—Fort Worth 2003, no pet.)). Damages for physical impairment "extend[ ] beyond loss of earning capacity and beyond any pain and suffering, to the extent that it produces a separate loss that is substantial or extremely disabling." *Id.* Thus, "[t]o recover damages for physical impairment, the plaintiff must show that (1) he or she incurred injuries that are distinct from, or extend beyond, injuries compensable as pain and suffering, loss of earning capacity, or other damage elements and (2) these distinct injuries have had a 'substantial' effect." *Id.* "If other elements such as pain, suffering, mental anguish, and disfigurement are submitted, there is little left for which to compensate under the category of physical impairment other than loss of enjoyment of life." *Golden Eagle Archery v. Jackson*, 116 S.W.3d 757, 772 (Tex. 2003).

Physical impairment may be demonstrated by evidence such as the plaintiff's inability to complete or perform everyday non-work related tasks as a result of the plaintiff's injury. *See, e.g.*, *Burry*, 203 S.W.3d at 554–55 (as a result of injuries, plaintiff was unable to read to her children, or drive a car without supervision—"[e]very aspect of her experience in the world has been altered as a result of this injury to the brain."); *Rentech Steel, L.L.C. v. Teel*, 299 S.W.3d 155, 166 (Tex. App.—Eastland 2009, pet. dism'd) (plaintiff was unable to open a water, button his shirt, write, use a computer normally, and suffered a general decline in athletic capabilities); *Gordon v. Redelsperger*, No. 02-17-00461-CV, 2019 WL 619186, at \*14 (Tex. App.—Fort Worth Feb. 14, 2019, no pet.) (mem. op.) (plaintiff's injury caused decline in non-work-related skills, including the ability to eat and communicate with others, run, and use stairs). In other words, the jury may award damages for physical impairment where the evidence that the plaintiff's ability to do many things they once enjoyed is now limited. *Golden Eagle Archery*, 116 S.W.3d at 771–72 n.62.

Su Min, Ji Hun, Mrs. Kim and Mr. Kim all testified about the impact of Su Min's injuries

on her daily life. Before the accident, Su Min was a healthy, active individual. She played violin, piano, soccer, flag football, and basketball, and enjoyed exercising in a variety of other ways including yoga, walking outside, and going to the gym. She was able to live independently and care for herself completely. Now, as described by Su Min, she is no longer able to do anything by herself. While she can physically walk around her home, Mrs. Kim has to follow behind her constantly in case Su Min falls or has a seizure. Due to her physical limitations including vision loss, Su Min is unable to drive a car or run outside. She cannot participate in any of the sports she once enjoyed. She cannot cook by herself. She cannot even watch television without suffering from a headache. Ji Hun stated that Su Min has difficulty communicating beyond holding a light conversation. Mr. Kim doubts that Su Min will ever be able to live independently again. Due to the injuries she sustained in the accident, Su Min can do the bare minimum of getting dressed by herself—but nothing more.

Despite this evidence, Honda contends that Su Min's condition could have improved more "but for her parent's decision to discontinue her physical therapy" (Dkt. #138 at p. 20). Mr. Kim did testify at trial that Su Min is not currently attending physical therapy in the United States. But Mr. Kim explained that this is only because they did not see much improvement from treatment in the United States compared to the therapy and rehabilitative treatment Su Min received in Korea. Because of this, Mr. Kim stated that he plans for Su Min to continue her treatment in Korea during the summer. Regardless of where Su Min receives treatment, every medical expert that testified for Plaintiffs agreed that regardless of therapy, there is a limit to how much Su Min can improve due to the irreversible, structural changes to her brain. While Honda may disagree with this, it is the jury who is ultimately charged with deciding disputed issue of fact—not Honda. And here, the jury was not convinced that Su Min's lack of continuous physical therapy treatment completely

offset her past and future physical impairment. Instead, the jury awarded Su Min $500,000 for past physical impairment, and $2,000,000 for physical impairment that, in reasonable probability, Su Min will sustain in the future. The evidence introduced at trial was sufficient to support this finding. After a review of the record, the Court finds that substantial evidence was introduced at trial to support this finding.  Accordingly, Honda is not entitled to judgment as a matter of law or a new trial on this basis.

### 4.  Past and Future Mental Anguish

Honda next asserts that the amount the jury awarded for Su Min's past and future mental anguish should be "deleted" because "[t]here is no evidence Su Min was treated by any therapist, counselor, or psychiatrist" (Dkt. #139 at p. 20). Recovery of mental anguish damages requires "direct evidence of the nature, duration, and severity" of a plaintiff's mental anguish that causes "a substantial disruption" to the plaintiff's routine, or "evidence of 'a high degree of mental pain and distress' that is 'more than mere worry, anxiety, vexation, embarrassment, or anger.'" *Parkway Co. v. Woodruff,* 901 S.W.2d 434, 444 (Tex. 1995) (quoting *J.B. Custom Design & Bldg. v. Clawson,* 794 S.W.2d 38, 43 (Tex. App.—Houston [1st Dist.] 1990, no writ)). Mental anguish damages "cannot be determined by mathematical precision; by their nature, they can be determined only by the exercise of sound judgment." *Bentley v. Bunton*, 94 S.W.3d 561, 605 (Tex. 2002); *see also Burry*, 203 S.W.3d at 551–52 ("The process of awarding damages for amorphous, discretionary injuries such as mental anguish . . . is an inherently subjective question."). "No objective measures exist for analyzing pain and suffering damages." *Burry*, 203 S.W.3d at 552 (citations omitted); *see also SCI Tex. Funeral Servs., Inc. v. Nelson*, 540 S.W.3d 539, 544 (Tex. 2018) ("The existence of mental anguish is inherently difficult to verify."). "Thus, once the existence of some pain and suffering has been established, there is no objective way to measure

the adequacy of the amount awarded as compensation." *Id.*

"[G]iven the impossibility of any exact evaluation of mental anguish, juries must be given a measure of discretion in finding damages, though that discretion is limited." *Bennett v. Grant*, 525 S.W.3d 642, 648 (Tex. 2017) (cleaned up). However, juries cannot simply pick a number and put it in the blank. *Id.* "They must find an amount that, in the standard language of the jury charge, would fairly and reasonably compensate for the loss." *Id.* (cleaned up). The amount awarded must be fair and reasonable compensation, given the evidence presented. *Id.*

Evidence of mental anguish can include "painful emotions such as grief, severe disappointment, indignation, wounded pride, shame, despair, public humiliation, or a combination of any or all of those feelings." *Thomas v. Uzoka*, 290 S.W.3d 437, 455 (Tex. App.—Houston [14th Dist.] 2009, pet. denied). Additionally, "[w]here the plaintiff herself has been seriously injured, mental anguish may be inferred by the factfinder." *Holcombe*, 2022 WL 354974, at *3 (citing *Popkowski v. Gramza*, 671 S.W.2d 915, 919 (Tex. App.—Houston [1st Dist.] 1984, no writ.)). "Mental anguish can be established through testimony from the injured party explaining how she felt and how her life was disrupted," or through testimony of third parties and experts. *Tagle v. Galvan*, 155 S.W.3d 510, 519 (Tex. App.—San Antonio 2004, no pet.); *see also, e.g.*, *Rentech Steel*, 299 S.W.3d at 166 (mental anguish demonstrated by family members, surgeon, and counselor of plaintiff who testified about plaintiff's "withdrawal from others, the loss of his friends, his depression," and "his anguish in coping with his injuries").

The jury heard ample evidence about the mental anguish Su Min endured after the accident and continues to endure as a result of the injuries she sustained in the collision. Su Min began by describing herself before the accident as a social person with a bubbly personality who enjoyed making connections with others. As Ji Hun put it, she always had a lot of friends around her as and

was very outgoing person. Fedkenheuer also agreed that before the accident, Su Min was friendly, happy, and cheerful. He added that she could make everyone in the room laugh, and was always able to laugh at herself. He described her as someone who was very introspective—someone who thought deeply about life and what she wanted out of it.

But after the accident, Su Min was not the same. Su Min stated that she became very withdrawn, and now she rarely feels comfortable leaving her house. She struggles coping with her injuries, and has lost all of her friends and relationships outside of her immediate family. Ji Hun, Mrs. Kim, and Mr. Kim each provided similar testimony on the severe impact the accident has had on Su Min's mental health.

Dr. Cowles also testified about Su Min's post-accident struggle with anxiety and depression. He stated that the physical damage to her brain is not the type that would make her unaware that she is now unable to do the things she used to enjoy. Rather, he stated that Su Min is acutely aware of her shortcomings, which causes her great mental distress. In fact, Dr. Cowles testified that he was so concerned about Su Min's level of depression that he reached out to her primary care doctor to express his concerns, and noted how Su Min might benefit from anti-depressants. Additionally, Dr. Bigler testified about Su Min's risk of future psychiatric disorders. He specifically discussed her heightened risk for depression and suicidal tendencies, as well as early onset dementia.

After hearing this evidence, the jury awarded Su Min $2,000,000 for mental anguish sustained in the past, and $4,000,000 for mental anguish that, in reasonable probability, Su Min will sustain in the future. Contrary to Honda's argument, the fact that Su Min has not sought therapy or other psychiatric treatment does not preclude an award for mental anguish because the record contains other types of evidence—including medical assessments and personal

testimonials—that Su Min did and continues to experience mental anguish as a result of the accident. The Court is persuaded that the amount the jury awarded for Su Min's past and future mental anguish is fair and reasonable, and sufficiently supported by the evidence admitted at trial. Accordingly, Honda is not entitled to judgment as a matter of law or a new trial on this basis.

### 5.   Past Disfigurement

Honda next argues that the amount awarded for Su Min's past disfigurement is not supported by the evidence because "[t]here is no evidence to indicate that Su Min suffered any serious, permanent scarring or other outward physical deformity" (Dkt. #139 at p. 20). "Disfigurement has been defined as that which impairs the appearance of a person." *Figueroa v. Davis*, 318 S.W.3d 53, 64 (Tex. App.—Houston [14th Dist.] 2021, no pet.). The term includes "an impairment or injury to the beauty, symmetry, or appearance of a person or thing, rendering it unsightly, misshapen, imperfect, or deformed in some manner." *Rentech Steel*, 299 S.W.3d at 165 (citing *Goldman v. Torres*, 341 S.W.2d 154, 160 (1960), and *Pendergraft v. Carrillo*, 273 S.W.3d 362, 367 (Tex. App.—Eastland 2008, pet. denied)). "Disfigurement damages are available when a plaintiff suffers scarring, 'even when the scar is located on a part of the body that is usually covered by clothing.'" *Holcombe*, 2022 WL 354974, at *4 (quoting *Tellez v. GEO Grp., Inc.*, No. 5:15-CV-465, 2017 WL 3271677, at *8 (W.D. Tex. Aug. 1, 2017)).

Honda's opinion that there is no evidence Su Min sustained permanent disfigurement or scarring is simply incorrect. To be sure, both Mr. Kim and Ji Hun identified the exact location and reason for several permanent, physical scars on Su Min's neck and head. When Su Min was taken to the hospital after the accident, she was unconscious for several weeks. As a result, Su Min had a feeding tube attached to the left side of her stomach, and a breathing tube attached to a hole in her neck. When the devices were removed, they left her with permanent scarring on her stomach

and her neck. Su Min herself confirmed the existence and location of the scars, stating that she is constantly bothered by these physical changes to her body.

Apart from scarring, there was also evidence of physical deformities to Su Min's skull and face. Dr. Cowles discussed how the blunt force trauma to Su Min's head caused her skull to cave inwards and further stated that Su Min also broke the bones in her left eye socket. After several surgeries to reduce the swelling in Su Min's brain, the surgeons had to remove part of her skull and replace it with a titanium plate that will remain indefinitely. However, some damage to the bone structure on the left side of Su Min's skull and eye socket remained. As a result of these injuries, Mr. Kim and Mrs. Kim described how Su Min's face became asymmetrical and bulges out towards the left.

The jury awarded Su Min $500,000 for the physical disfigurement she sustained in the past. Having reviewed the record, the Court is persuaded that substantial evidence was introduced at trial to support this finding. Accordingly, Honda is not entitled to judgment as a matter of law or a new trial on this basis.

**B.  Ji Hun's Damages for Past Mental Anguish**

Honda next asserts that the amount awarded to Ji Hun for his bystander mental anguish damages should be deleted because "[t]here is no evidence of any mental or emotional trauma sustained by Ji Hun due to his having witnessed the injuries suffered by Su Min" (Dkt. #138 at p. 21). To recover for bystander mental anguish damages, Ji Hun must establish:

   (1) he was located near the scene of the accident, as contrasted with one who was a distance away from it;

   (2) he suffered shock as a result of a direct emotional impact upon him from a sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence; and

   (3) he and Su Min were closely related as contrasted with an absence of any

relationship or the presence of only a distant relationship.

*United Servs. Auto. Ass'n v. Keith*, 970 S.W.2d 540, 541–42 (Tex. 1998) (per curiam). Without question, the first and third elements were satisfied here. Ji Hun is the brother of Su Min and was in the vehicle with her when the accident occurred.

However, Honda argues that there is no evidence to support the second element—that Ji Hun suffered a direct emotional impact because of his observation of the accident. Texas law permits the recovery of mental anguish damages for bystanders who witness the serious of fatal injury of a close relative. *Id.* at 541–42. Specifically, the bystander may recover for injuries of such a "shocking and disturbing nature that mental anguish is a highly foreseeable result." *City of Tyler v. Likes*, 962 S.W.2d 489, 496 (Tex. 1997). "Whether damages are reasonably foreseeable is a finding of fact within the province of the jury." *Miss. Chem. Corp. v. Dress-Rand Co.*, 287 F.3d 359, 371 (5th Cir. 2002) (citing *Migerobe, Inc. v. Certina USA, Inc.*, 924 F.2d 1330, 1338 (5th Cir. 1991)).

Like Honda asserted in attacking Su Min's mental anguish award, Honda takes issue with the fact that Ji Hun never attended counseling for any mental trauma allegedly caused by the accident (Dkt. #138 at p. 21). The Court is, again, not persuaded by this argument. Regardless of whether Ji Hun attended therapy, the record contains sufficient evidence that Ji Hun did suffer mental anguish, and the extent to which his mental anguish could have been lessened by therapy was an issue for the jury to decide.

First, two different emergency responders testified about Ji Hun's reaction to seeing Su Min injured. Tyler Tibbits, one of the Frisco Police Department officers who responded to the scene, testified that he observed Ji Hun and spoke to him at the hospital. He described Ji Hun as upset and down, and in a distraught state. Keith Steel ("Steel"), a firefighter paramedic that also

responded to the scene, described the shocking nature of Su Min's injuries that Ji Hun witnessed. Steel stated that when he arrived, he could immediately tell that Su Min's face was swollen, she had a depressed skull fracture, she was bleeding from her head and her mouth, and she was completely unconscious. Her breathing was shallow and slow, to the point that Steel was concerned she would stop breathing at any minute. Ji Hun watched as Steel was forced to intubate Su Min on the spot. Su Min then had to be forcibly removed from the vehicle.

Ji Hun then described the accident from his perspective. When the accident happened, Ji Hun was only seventeen-years-old at the time. He said the first memory he has is being woken up by the EMTs. He testified that he was in a state of shock and had no idea what was going on. However, when he turned to the right to check on Su Min, the gravity of the situation set in. He stated that he saw his sister unconscious and her shirt covered in blood. She would not wake up and Ji Hun could not figure out where the blood was coming from. He kept trying to wake her up to no avail, and began shouting that she could be dead. When Ji Hun was able to exit the vehicle, he immediately called Mr. Kim who tried to calm Ji Hun down over the phone. But at that point, Ji Hun stated that he was still in shock because he believed his sister to be dead. Ji Hun then described how the trauma and distress that he experienced that day continues to impact his life. Despite the passing of time, Ji Hun is unable to bring himself to drive with Su Min in the front seat as he is anxious that the accident will happen again.

After hearing the evidence, the jury awarded Ji Hun $250,000 in damages for the bystander mental anguish he sustained in the past. The Court is persuaded that the amount the jury awarded Ji Hun is fair and reasonable, and supported by substantial evidence.

## III.    Evidentiary Rulings

Honda moves for a new trial, based on several evidentiary rulings the Court made before

and during trial. Specifically, Honda states the following rulings were erroneous: (1) admitting the expert testimony of Hannemann and Ziejewski; (2) admitting evidence of testing conducted by General Motors and relied on by Plaintiffs' experts; (3) admitting animations created and relied on by Plaintiffs' experts; and (4) refusing to admit Honda's evidence of industry custom (Dkt. #139 at pp. 12–13). The Court will address each of these issues in turn.

### A.  Testimony of the Plaintiffs' Expert Witnesses

First, Honda contends that the Court should have excluded Hannemann's and Ziejewski's testimony pursuant to Federal Rule of Evidence 702. As Plaintiffs' note, this Court has previously addressed this argument in its Orders denying Honda's pre-trial motions to exclude the experts' testimony (Dkt. #74; Dkt. #75). Thus, the issue has already received full and fair treatment. Indeed, Honda offers no new arguments in the present motion for why Hannemann's and Ziejewski's testimony should have been excluded. Accordingly, the Court declines to revisit the issue.

### B.  Evidence of Testing Conducted by General Motors

Next, Honda argues the Court erred by allowing Plaintiffs to use, for demonstrative purposes, center airbag tests conducted by General Motors. Honda claims the evidence should not have been shown to the jury even for demonstrative purposes "because it too closely resembled the accident in this case to effectively present abstract principles (about side-impact collisions) without misleading the jury" (Dkt. #139 at p. 13).

District courts have wide discretion in admitting or excluding evidence of experimental testing. *United States v. Norris*, 217 F.3d 262, 270 (5th Cir. 2000). If the test is intended to be a re-creation of the event at issue in the case, the proponent must demonstrate that the test was conducted under "substantially similar conditions." *Id.*; *see also More, JC, Inc. v. Nutone Inc.*, A-05-CA-338, 2007 WL 4754173, at *7 n.5 (W.D. Tex. Mar. 21, 2007) (collecting cases) ("The more

the experiment appears to simulate the accident, the more similar the conditions of the experiment must be to the actual accident conditions."). On the other hand, if the proponent offers the test not as a re-creation but as a demonstration of general scientific principles, "it need not pass the substantial similarity test." *Muth v. Ford Motor Co.*, 461 F.3d 557, 566 (5th Cir. 2006). However, even when used for demonstrative purposes, the evidence must not be misleading, by, for example, too closely resembling the actual events and circumstances of the case. *Id.*; *Riley v. Ford Motor Co.*, No. 09-148, 2011 WL 3236109, at *4 (S.D. Miss. July 27, 2011).

At trial, the Court allowed Plaintiffs to show the jury a video of testing conducted by General Motors to show the effectiveness of a center airbag. The video shows two pole impact crash tests related to the use of a center airbag—one test performed with a center airbag installed, and one without. In the video, two crash dummies are positioned in the front row of the vehicle when the side of the vehicle strikes the pole. As described by Hannemann, the tests show that the dummies had a greater range of movement towards the struck side of the vehicle when no center airbag was installed. Conversely, when the center airbag was installed, Hannemann contends that the tests show how a center airbag can act as a cushion to prevent head-to-head contact between a driver and passenger.

When the evidence was used at trial, Plaintiffs were permitted to rely on it only for demonstrative purposes. Hannemann made clear on both direct and cross examination that he was only referencing to the tests to demonstrate the general idea and intended benefit of a center airbag, and that the tests were not intended to be a recreation of the accident in this case. The Court also gave a limiting instruction to the jury that the video was only a demonstrative to show how a center airbag works, and should not be considered by the jury as a recreation of Plaintiffs' accident.

Honda argues that even as a demonstrative, the evidence too closely-related to the accident

in this case, and thus must meet the substantial similarity test, which Honda contends cannot be satisfied here. Honda cites to the Fifth Circuit's decision in *Muth v. Ford Motor Company* in support of its position. However, *Muth* is distinguishable. In *Muth*, the trial court excluded certain testing evidence that Ford intended to use to illustrate how a stronger roof would do little to prevent injuries in rollover accidents. *Muth*, 461 F.3d at 565–66. Although Ford argued that the evidence was offered only as a demonstration of general scientific principles—meaning that "it need not pass the substantial similarity test"—Ford also characterized the evidence as depicting its theory of how the vehicle at issue moved in the accident. *Id.* The trial court excluded the demonstrative evidence and the Fifth Circuit affirmed, explaining that the possibility the evidence could be misconstrued as a "reenactment" was "sufficient to justify the district court's exercise of discretion" in excluding it. *Id.* at 567.

Here, similar to *Muth*, the General Motors tests were not required to meet the substantial similarity test. Hannemann relied on the General Motors tests to demonstrate general scientific principles, and neither Hannemann nor Plaintiffs' counsel ever purported that the tests simulated the circumstances of the accident in this case. *See, e.g.*, *Barnes v. Gen. Motors Corp.*, 547 F.2d 275, 277 (5th Cir. 1977) (holding admission of experiment was in error where plaintiff's expert created a test "purporting to simulate the circumstances" of the accident at issue, yet did not conduct test under substantially similar conditions). However, unlike in *Muth*, the tests conducted by General Motors were not so similar to Plaintiffs' accident that they could be considered by the jury as a reenactment. The accident in this case involved two vehicles—Plaintiffs' CR-V and Hubbard's Scion. The accident occurred when Hubbard's Scion struck the passenger-side of the CR-V. In comparison, the testing conducted by General Motors involved a General Motors vehicle that collided with a stationary pole on the driver's side of the vehicle. And, as Honda pointed out

before trial (*see* Dkt. #69 at pp. 8–9), the tests were not conducted at the same speed as the vehicles involved in Plaintiffs' accident, and did not involve dummies that were similar in height and weight to Ji Hun and Su Min. Further, the dissimilarities between the testing conducted by General Motors and the accident in this case were made plain for the jury in both the direct and cross examinations of Hannemann, which lessened any risk the evidence could be misleading. *See Carson v. Polley*, 689 F.2d 562, 579 (5th Cir. 1982) (explaining that testimony clearly showing the differences between the evidence and the actual events can lessen the danger of misleading the jury).

Considering the differences between the General Motors tests and Plaintiffs' accident, as well as Plaintiffs' repeated insistence at trial that the tests were only intended as a demonstrative to show how a center airbag is generally designed to work, the Court did not err in allowing the Plaintiffs to show the tests to the jury. Moreover, there is no evidence or indication on the record that the jury was misled into believing that the General Motors tests were a recreation of the accident in this case. Further, the Court did give a limiting instruction which minimizes any risk of prejudice to Honda. Accordingly, Honda is not entitled to a new trial on this ground.

### C.  Plaintiffs' Animations

Honda also objected to a series of video animations created at the direction of Hannemann and Ziejewski that Plaintiffs were permitted to show the jury for demonstrative purposes. At the pre-trial conference, Honda objected to the animations on multiple grounds—including untimely disclosure, relevance, unfair prejudice, and noncompliance with expert requirements under Rule 702. After hearing argument from both sides, the Court ruled it would not allow the animations to be admitted but would allow Plaintiffs to use the animations for demonstrative purposes. Honda again objected, arguing that the animations did not involve forces and factors similar to the accident at issue.

Although Plaintiffs contend the animations were intended only as a demonstration of general engineering principles to show how their alternative designs would work, it is the Court that is charged with determining whether the evidence is properly categorized as a demonstration or a recreation. *See McKnight*, 36 F.3d at 1402–03 (rejecting proponent's characterization of evidence as demonstrating scientific principles and instead finding that the evidence "sought to recreate events that gave rise to trial"); *Muth*, 461 F.3d at 566–67 (affirming district court's rejection of proponent's characterization of evidence as only demonstrating scientific principles, not as recreation). While it is a close call whether the animations are best characterized as an illustration of general principles or as a recreation of the accident, the Court finds its decision to allow Plaintiffs to use the animations demonstratively was not in error.

The animations depict a 3D rendering of the accident in this case. The first animation depicts Hubbard's Scion colliding into the Plaintiffs' CR-V in the general location and setting where the accident occurred. Plaintiffs used this first animation at trial to help the jury understand generally how the accident occurred. The second animation depicts the accident occurring if the CR-V was equipped with a center airbag. Similarly, the third animation depicts the accident occurring if the CR-V was equipped with reverse geometry seatbelts. At trial, Hannemann and Ziejewski stated that they were only using these animations to help illustrate how center airbags and reverse geometry seatbelts are generally designed to operate in a collision. Both experts made clear that the animations were not intended to be an exact replica of the accident.

Nonetheless, unlike the General Motors testing, the animation depicted a scene that was very close to the actual accident. This resemblance to the Plaintiffs' accident "gives rise to the requirement of substantial similarity." *Muth*, 461 F.3d at 566. Accordingly, the Court concludes that the substantial similarity test applies to determine the admissibility of the animations.

41

Under that precedent, a district court generally has "wide discretion to admit evidence of experiments conducted under substantially similar conditions." *Barnes*, 547 F.2d at 277. For the animation to be admissible, Plaintiffs are not required to show that the animation was conducted under identical conditions as the actual accident. *Id.* Rather, Plaintiffs must show that the animation was conducted under conditions "nearly the same in substantial particulars as to afford a fair comparison in respect to the particular issue to which the test is directed." *Id.* The Court finds Plaintiffs have satisfied this requirement.

In his role as an accident reconstructionist, Ziejewski stated he gave feedback on how to illustrate the conditions of the accident in the animations, and he was forthcoming in explaining the conditions that were and were not able to be incorporated into the animations. To aid in his advisement, Ziejewski relied on diagrams drawn by the police officers who attended the scene as well as a street view on Google earth of where the accident occurred. He took measurements and made sure the angle and orientation of the accident as depicted in the animations was correct. He also relied on the CR-V's pre-crash data that showed the speed the CR-V was traveling at the time of the accident and an attempted evasive maneuver by Ji Hun. After reviewing all of this data, he was able to determine that the principal direction of force coming from Hubbard's Scion was between two and three o'clock. Ziejewski's conclusions on the conditions and manner in which the collision occurred are substantially the same as those depicted in the animations.

As to the body position and movement of Ji Hun and Su Min, the animations depict Ji Hun driving the CR-V and Su Min riding in the front passenger seat. When the CR-V is struck, the animations show Ji Hun's torso leaning into Su Min's occupant compartment and his head striking Su Min's head. On cross-examination, Honda questioned Ziejewski about whether the animations accurately showed how their bodies moved and responded to the collision. Honda argued the

animations were not accurate because Honda's experts believed Su Min was leaning forward in her seat before the collision occurred, which was not shown in the animations. Honda also argued that the animations did not accurately show where the head-to-head contact occurred. Ziejewski first disagreed on whether the evidence clearly indicated that Su Min was leaning forward, but regardless explained that the animations were not intended to be an exact mathematical replica of body movement. He stated that no mathematical calculations were performed to determine the bodily movement as shown in the animations because the animations were only intended to be a general illustration of the accident and how Su Min's injuries occurred. In regards to the location of the head-to-head contact, Ziejewski testified that the animations show the contact generally occurring in the occupant space because that is where he concluded the contact occurred based on his research and study of the accident. He noted that despite his conclusion, it is impossible for anyone to know exactly where the contact occurred.

While Honda argues that not every aspect of the animations is identical to the conditions of the actual accident, perfection is not the standard. *Barnes*, 547 F.2d at 277. The animations provide a fair comparison of the general conditions in which the accident occurred, based on the facts and data that Ziejewski acquired. *Id.; see also Apache Corp. v. Glob. SantaFe Drilling Co.*, No. 06-1643, 2012 WL 3263897 (W.D. La. Aug. 8, 2012) (explaining that a computer animation of an expert's theory will be shown to the jury assuming that a proper foundation is laid by the witness). While Honda frames its argument as an attack on the accuracy of the animations, it appears that Honda's true disagreement is with how Plaintiffs' experts believe the accident and injuries occurred. While Honda has its own opinion on these matters, the accident as depicted in Plaintiffs' animations is based on the research and experience of Plaintiffs' experts and has sufficient evidentiary support. *See Heatherly v. Nat'l Presto Indus., Inc.*, No. SA-07-CA-0062,

2008 WL 11334519, at *6 (W.D. Tex. Dec. 3, 2008) (finding that expert's re-creation satisfied the substantially similar test in part because the witness relied upon sufficient factual information, employed valid methodologies, and his methods were properly applied to the facts in issue). How the accident actually occurred—including, for example, where the head-to-head contact truly happened—were issues of disputed fact to be decided by the jury. Thus, Honda's objection to the animations goes to their weight, not their admissibility.

The situation here is similar to *Robinson v. Missouri Pacific R. Co.*, 16 F.3d 1083 (10th Cir. 1994).  In *Robinson*, the Tenth Circuit analyzed the admissibility of two animations: one video that was intended to illustrate the expert's theory of how the train accident occurred and another video that showed how a competing theory was unsupported by the evidence. *Id.* at 1087. The Tenth Circuit affirmed the trial court's decision to admit both animations because the first video was "illustrative of the expert's testimonial theory of the accident," despite objections regarding missing or inaccurate details. *Id.* The second video was admitted because it was offered for "solely illustrative purposes," the district court gave the jury a cautionary instruction, and the witness was subject to cross-examination for his theory. *Id.* at 1088.

Here, the Court admitted the three animations for demonstrative purposes regarding Plaintiffs' theory of the case. Plaintiffs' experts laid the proper foundation for these animations, the Court gave the jury an instruction regarding demonstrative evidence, and the witnesses were subject to cross-examination regarding the animations. The Court took steps to ensure that the jury knew this was not an exact recreation of the events, and the testimony of the witnesses only reinforced that idea. *See Hinkle v. City of Clarksburg, W.Va.*, 81 F.3d 416, 425 (4th Cir. 1996) ("[W]e are satisfied the jury here fully understood this animation was designed merely to illustrate Appellees' version of the shooting and to demonstrate how that version was consistent with the

44

physical evidence."). Accordingly, it was not error for the Court to allow Plaintiffs to use the animations for demonstrative purposes.

### D.  Evidence of Industry Custom

During trial, Honda attempted to introduce evidence of a bulk list of manufacturers who did use a front center airbag into their designs at the time the CR-V was manufactured in 2014. Honda argued the evidence was admissible for two different reasons. First, Honda asserted the evidence was admissible to controvert Plaintiffs' allegations of feasibility. The Court did not admit the evidence for this purpose because, as discussed in detail *infra*, feasibility was not contested. Second, Honda argued the evidence was admissible because it was relevant to the "consumer expectations" and "the industry's perception of the danger associated with a product," factors that may be considered when deciding if a design is unreasonably dangerous. For this purpose, the Court still did not allow Honda's list of manufacturers to be presented to the jury, but the Court did allow Honda to question witnesses about the use of center airbags in the industry prior to 2014. Honda now argues that the Court erred in excluding its list as evidence of industry custom.

To support its argument, Honda primarily relies on *Carter v. Massey-Ferguson, Inc.*, 716 F.2d 344 (5th Cir. 1983), and *Boatland of Houston, Inc. v. Bailey*, 609 S.W.2d 743 (Tex. 1980). Honda's reliance on these two cases misses the mark. First, in *Boatland*, the Texas Supreme Court found evidence of industry custom relevant when offered to rebut a plaintiff's evidence of feasibility. 609 S.W.2d at 748–49. However, while industry custom evidence was relevant to the contested issue of feasibility in *Boatland*, feasibility was not a contested issue in the present case. Thus, Honda's industry custom evidence was not relevant, or therefore admissible, for this purpose.

In *Carter*, the Fifth Circuit held that evidence of industry custom was relevant to proving

an ordinary consumer's expectations of a product. In the same vein, however, the Fifth Circuit recognized that this type of evidence "play[s] a small role in the overall balance of risk and utility." *Carter*, 716 F.2d at 348. Further, the court explained that industry custom evidence has a "low probative value" in cases where "neither the feasibility of an alternative design nor the foreseeability of harm is at issue." *Id.* at 349. The Fifth Circuit also stressed that industry custom evidence may cause "jury confusion by introducing a negligence concept into a strict liability case." *Id.*

Here, the Court does not disagree that industry custom evidence has some relevance to the risk-utility analysis. However, the type of evidence Honda desired to show the jury—a blanket list of all manufacturers that did not use one of Plaintiffs' alternative designs—contributed very little to the discussion. Honda's list contained no explanation of why these manufacturers did not, for example, use a center airbag in their vehicle designs, or even if the manufacturers had considered using a center airbag and decided against it. To be sure, Honda offered no supporting testimony that the manufacturers on its list considered the proper balance of product safety, cost, and functionality in opting against the use of a center airbag. Thus, the evidence had minimal probative value in showing why an ordinary consumer would expect a manufacturer not to design a vehicle with a center airbag. Without any of this important contextual information, the only probative value Honda's list offered was simply shown that Honda designed the CR-V in the same general manner as other manufacturers. But "[t]he fact that 'everyone else is doing it' . . . says nothing about whether 'the risk of danger inherent in the challenged product design outweighs the benefits of such design.'" *Kim v. Toyota Motor Corp.*, 424 P.3d 290, 303 (Cal. 2018) (Dato, J. concurring). Because of this, the Court concluded that the evidence carried a high risk of inviting the jury to conflate the risk-utility analysis with the reasonableness of Honda's design choices. *Carter*, 716

F.2d at 349. Thus, the Court did not admit the evidence because the risk of jury confusion substantially outweighed any minimal probative value the evidence carried. FED. R. EVID. 403.

Moreover, Honda was not completely "prevented from showing that no other manufacturer used a front center airbag at the time the CR-V was manufactured" like Honda purports (Dkt. #139 at p. 14). On multiple occasions, the Court permitted Honda to ask witnesses, including Hannemann and Ziejewski, what other manufacturers used a center airbag or reverse geometry seatbelt before 2014. Specifically in the cross-examination of Hannemann, Honda had Hannemann testify that no manufacturer used a front center airbag until 2013, and even in 2013 the only manufacturer that implemented a center airbag was General Motors. From this testimony, the jury could easily draw the inference that if only one manufacturer is using a design, the majority of other manufacturers are not using the design. *See Reeves*, 530 U.S. at 150 (recognizing that "the drawing of legitimate inferences from the facts" is a function of the jury). Thus, the Court's decision to exclude Honda's list of manufacturers did not stop Honda from making its point.

In sum, Honda has not satisfied its burden of demonstrating that the Court's decision to exclude Honda's list of manufacturers was unfair or prejudicial. *See Transworld Drilling Co*, 773 F.2d at 613. Accordingly, Honda is not entitled to a new trial on this basis.

## IV.    Charge Errors

Honda also moves for a new trial because of alleged errors in the jury charge. Under Federal Rule of Civil Procedure 51, a party must inform the Court of its objection on the record regarding a given instruction or the failure to give an instruction. FED. R. CIV. P. 51(c)(1). When a given instruction is challenged and the issue is properly preserved, the Fifth Circuit has two requirements that must be met before a new trial will be granted based on an erroneous jury instruction. *True Believers Ink 2, Corp. v. Russell Brands, LLC*, No. 4:18-CV-432, 2020 WL

2113600, at *3 (E.D. Tex. May 4, 2020). First, the movant must show that "the charge as a whole creates substantial and ineradicable doubt whether the jury has been properly guided in its deliberations. *Id.* (citing *Hatsell v. Doctor Pepper Bottling Co.*, 207 F.3d 269, 272 (5th Cir. 2000)). Second, "even if the instruction was erroneous, the instruction must have affected the outcome of the case." *Id.* When the failure to given an instruction is properly preserved, a court will find reversible error only if the requested instruction "1) was a substantially correct statement of law, 2) was not substantially covered in the charge as a whole, and 3) concerned an important point in the trial such that the failure to instruct the jury on the issue seriously impaired the [party]'s ability to present a given claim." *Janvey v. Dillon Gage, Inc. of Dallas*, 856 F.3d 377, 388 (5th Cir. 2017) (citing *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 505 (5th Cir. 2012)). If no objection is made, the issue is not properly preserved and a court will only review for plain error. *Hatsell*, 207 F.3d at 272.

At trial, Honda raised several objections to the Court's charge. First, Honda objected to the Court's failure to submit an instruction on the presumption of no-liability found in Texas Civil Practice and Remedies Code § 82.008. Second, Honda objected to the Court instructing the jury that Honda was not contesting feasibility. Third, Honda objected to the submission of this case at all to the jury. And fourth, Honda objected to Question 1 of the verdict form not being split into two separate questions.

In its motion for new trial, Honda alleges the Court's charge was erroneous because it (1) failed to instruct the jury on the § 82.008 presumption,[4] (2) improperly instructed the jury on Honda's position as to feasibility, and (3) improperly instructed the jury on the law related to "safer alternative design." The Court addresses each of these arguments below.

---

[4] Honda asserts the same argument on the applicability of the § 82.008 presumption in its renewed motion for judgment as a matter of law.

### A.  Instruction on § 82.008's Presumption of No Liability

Honda requested the Court instruct the jury that Honda was presumed not liable for any design defect in the CR-V pursuant to Texas Civil Practice and Remedies Code § 82.008. In its Order on the Presumption, the Court ruled Honda was not entitled to the presumption, and thus not entitled to its requested instruction. *See* (Dkt. #113). Honda asserts this decision was in error.

Under § 82.008, a manufacturer is entitled to a presumption of nonliability for its product's design if the manufacturer establishes (1) the product complied with mandatory federal safety standards or regulations that (2) were applicable to the product at the time of its manufacture and that (3) govern the product risk that allegedly caused the plaintiff's harm. *See Kia Motors Corp. v. Ruiz*, 432 S.W.3d 865, 870 (Tex. 2014) (interpreting § 82.008(a)). If the presumption applies, the plaintiff may rebut it by showing that (1) the applicable federal standards "were inadequate to protect the public from unreasonable risks of injury or damage," or (2) the manufacturer withheld information relevant to the federal government's determination of adequacy of the safety of the relevant federal standards. Tex. Civ. Prac. & Rem. Code § 82.008(b).[5]

Here, there is no dispute that the CR-V complied with mandatory federal safety standards and that the federal standards were applicable to the CR-V at the time of its manufacture in 2014. Rather, as the Court explained in its Order on the Presumption, the only issue in dispute is whether the applicable federal standards "governed the product risk that allegedly caused the harm." *Id.*

To accurately assess whether the presumption applies, it is necessary for a court to distinguish the plaintiff's alleged harm from the alleged product risk from the alleged defect. In this case, the Court analyzed these concepts and found that the product risk that allegedly caused Plaintiffs' harm was the risk of injury from a far-side impact during a near-side collision. The

---

[5] As discussed below, because the presumption did not apply in this case, the Court does not reach whether Plaintiffs rebutted the presumption.

Court further found that no federal standard governed that product risk. Honda claims the Court's analysis was incorrect. However, contrary to Honda's allegations, the Court's analysis is consistent with Fifth Circuit and Texas jurisprudence.

The Fifth Circuit has directly addressed § 82.008's presumption in two cases. Starting with *Wright v. Ford Motor Co.*, the Wrights' harm allegedly occurred when a vehicle with an obstructed rear-view backed over the Wrights' son, leading to his death. 508 F.3d 263, 267 (5th Cir. 2007). The Wrights alleged the design of the vehicle was defective because it had a large rear blind spot, and asserted it should have been equipped with a reverse safety device such as back-up alarm. *Id.* at 267–68. Because the Wrights' harm was a death attributed to the vehicle's obstructed rear-view, the Fifth Circuit determined that the product risk that caused the harm was the rear blind spot of the vehicle. *Id.* at 270. Based on this determination, the Fifth Circuit ruled the presumption applied because a federal regulation, FMVSS 111, expressly stated that it addressed rear blind spot risks. *Id.*

The Fifth Circuit later applied this same fact-specific formula in *Trenado v. Cooper Tire & Rubber Co.*, 465 F. App'x 375 (5th Cir. 2012). There, the harm allegedly occurred when a tire on the Trenados' van failed, resulting in a tragic rollover accident. *Trenado*, 465 F. App'x at 377. The Trenado family alleged the design of the van's tire was defective because the tire had an "undue propensity for late-life catastrophic tread separation failure." *Id.* at 379. Because the Trenados' injuries were allegedly caused by the inadequate durability of the tire, the Fifth Circuit determined that the risk that caused the Trenados' harm under § 82.008 was the risk of tire failure. *Id.* at 380. Because a federal regulation, FMVSS 109, addressed this risk, the Fifth Circuit ruled that the presumption applied. *Id.*

District courts within the Fifth Circuit have relied on this analysis as well. In *Hinson v.*

*Dorel Juvenile Group, Inc*., the harm occurred when a collision resulted in injuries to Hinson's child, who was riding in a forward-facing car seat at the time. No. 2:15-CV-713, 2016 WL 3361480, at *2 (E.D. Tex. June 9, 2016). Hinson alleged the labeling on the car seat was defective because it did not adequately instruct or warn of the risks posed by forward-facing versus reverse-facing car seats. *Id.* The court concluded that the product risk under § 82.008 was the "potential risk of enhanced and serious injury to very young children resulting from being positioned in the subject forward-facing car seat as opposed to a rear-facing car seat." *Id.* Because no federal regulation addressed the relative safety of rear-facing versus forward facing car seats, the court found the presumption did not apply. *Id.* at *3.

Similarly, in *Ramos v. Stellantis North America*, the harm occurred when Ramos's vehicle crashed and was engulfed in flames. No. 2:21-CV-00099, 2022 WL 3595140, at *2 (S.D. Tex. Aug. 2, 2022). The fire then entered the occupant compartment and caused the death of two of her children who were unable to exit the vehicle. *Id.* Ramos alleged the vehicle's rear ventilation flaps were defectively designed. *Id.* at *11. The court determined that the product risk was "fire spreading into the passenger compartment at a rate that prevented the occupants from safely exiting the vehicle." *Id.* Because FMVSS 302 governed this risk, the court held the presumption applied. *Id.*

Texas cases on the topic are no different. For example, in *Kia Motors Corp. v. Ruiz*, the harm occurred when the vehicle's driver airbag did not deploy during a collision, resulting in the driver's death. 348 S.W.3d 465, 471–72 (Tex. App.—Dallas 2011), *reversed and remanded on other grounds by* 432 S.W.3d 865 (Tex. 2014). The Ruiz family alleged the faulty circuitry in the vehicle's airbag system was defective. *Id.* The Texas appellate court held that the product risk that allegedly caused the harm was "the failure of a frontal airbag to deploy," and the Texas Supreme

Court affirmed. *Id.* at 472. Because no federal regulation addressed this risk, the presumption did not apply. *Id.*

In its Order on the Presumption, the Court previously analyzed this caselaw in order to determine the correct formulation of the product risk that allegedly caused Plaintiffs' injuries in this case. It is undisputed that the Plaintiffs alleged harm occurred when Su Min suffered a head-to-head impact with Ji Hun. Nonetheless, the scope of the relevant "product risk" is disputed. On one hand, Plaintiffs describe the product risk as "far-side impact injury to an occupant in a near-side collision." On the other hand, Honda broadly describes the product risk as "occupant injury in a side-impact collision." Honda's broad interpretation is not supported by the applicable law or the facts of this case.

First, the Texas Supreme Court has favored more case-specific constructions of product risks over the type of broad construction Honda requests this Court adopt. *See Kia*, 432 S.W.3d at 873. Moreover, were the Court to adopt Honda's interpretation of the risk, the presumption would apply in every case involving any type of side-impact collision, regardless of the plaintiff's alleged harm. Section 82.008 does not support such a result. To be sure, the plain language of § 82.008 expressly instructs that the product risk must be considered in the context of the plaintiff's alleged harm caused by that risk. TEX. CIV. PRAC. & REM. CODE § 82.008(a).

Contrary to Honda's interpretation, Plaintiffs do not assert that their injuries occurred because of the general risk of injury to occupants involved in any type of side-impact collision. Rather, Plaintiffs' alleged harm is specific to the position of Su Min in the vehicle—the passenger on the nearest side to the collision, and the manner in which she was injured—by head-to-head contact from the far-side occupant in the vehicle, Ji Hun. Thus, just as the Court previously held, a fair statement of the product risk in this case is "the risk of injury from a far-side impact during

a near-side collision."

Having identified the relevant product risk, the next step is to determine if a federal regulation exists that governs the product risk. TEX. CIV. PRAC. & REM. CODE § 82.008(a). In determining whether a federal regulation addresses the product risk, courts have relied on statements made by experts at trial, the stated purpose of the regulation, and the tests required by the regulation. *Wright*, 508 F.3d at 270; *Trenado*, 465 F. App'x at 308; *Kia*, 432 S.W.3d at 870. In its Order on the Presumption, the Court considered all of this evidence. While almost every other issue in this case was hotly contested, this was one issue that every single expert who testified at trial, as well as Honda's corporate representative, agreed on: there is no federal regulation or standard designed to protect the near-side occupant in a collision from far-side impact injuries. While Honda cited to four different Federal Motor Vehicle Safety Standards, none of the standards were intended to address the product risk at issue here. Indeed, the experts discussed the different tests required by these standards, and consistently agreed that none of the regulations required testing to address the risk of far-side injury to a near-side occupant. *Cf. Trenado*, 465 F. App'x at 308 (finding presumption applied where testing required by federal standard addressed product risk at issue).

Because no federal regulation exists that governs the product risk at issue in this case, the Court held that § 82.008's presumption does not apply. Although Honda did properly preserve this issue for review, the Court did not err in refusing to include an instruction on the presumption in the jury charge. Honda's ability to present its claims was not seriously impaired from a refusal to instruct the jury on a presumption that does not apply in this case. *Janvey*, 856 F.3d at 388. Honda raises no new arguments that the Court did not already consider and dispose of in its Order on the Presumption, and the Court finds no reason to doubt the validity of its prior decision. Thus, the

Court will not reconsider this issue further.

### B.  Instruction on Feasibility

Next, Honda argues that the Court erred in instructing the jury that Honda did not contest feasibility. To resolve this issue, the Court need only point to a pre-trial response brief filed by Honda. Prior to trial, the Court granted Honda's motion in limine to exclude evidence of subsequent remedial measures taken by Honda regarding the use of a center airbag. Plaintiffs filed for reconsideration of this issue, and Honda submitted a brief in response (Dkt. #100). Therein, Honda argued that evidence of subsequent remedial measures under Rule 407 could be admitted in trial only "if the feasibility of the measure is controverted" (Dkt. #100 at p. 1). Honda then plainly asserted:

> [C]ontrary to Plaintiffs' contentions, this exception is not triggered in this case. [Honda] stated to the Court and Plaintiffs' counsel during the pretrial conference that Honda does not contest the feasibility of the center airbag design since it was already in existence in the marketplace. *Thus, the issue of feasibility is not contested.*

(Dkt. #100 at pp. 1–2) (emphasis added).

Despite its prior statement, Honda now argues that it "conceded only that it did not contest the generic technological feasibility of the center airbag design since it already existed in the marketplace," but "did not concede the feasibility of a center airbag for this vehicle or this crash" (Dkt. #138 at p. 12). Honda further contends that it never conceded the feasibility of a reverse geometry seatbelt.

In addition to the pretrial briefing, the issue of whether feasibility would be contested in this case was discussed at the pretrial conference. At the pretrial conference, Honda declared to this Court and opposing counsel that it was not contesting the feasibility of the center airbag or the feasibility of the reverse geometry seatbelt. This statement arose after the parties went back and

forth on the admissibility of industry custom evidence. Plaintiffs argued that evidence of General Motors' use of a center airbag should be admitted to prove feasibility. Honda responded that the Court should not admit Plaintiffs' evidence for this purpose because Honda agreed that the technology was feasible. In fact, Honda quoted the definition of "feasibility" from Webster's Dictionary, defining the term as capable of being done. Honda then admitted that the technology existed in the marketplace at the time the CR-V was designed, and that Honda could have designed and installed a center airbag in their vehicles had it desired to do so. Thus, Honda's position as expressed as the pretrial conference was exactly that as expressed in the pretrial briefing—that Honda did not contest the general feasibility of center airbags or the feasibility of using center airbags in the CR-V.

Also at the pretrial conference, the parties discussed the admissibility of a photo of an alleged 1973 Honda experimental safety vehicle that was shown using a reverse geometry seat belt design. Plaintiffs argued that the photograph should be admitted at trial because it demonstrated the economic and technological feasibility of reverse geometry seatbelts. In response, Honda stated that it agreed to the feasibility of the design, and thus was not disputing whether the design could have been done in the CR-V. Instead, Honda stated that it intended to dispute the reasons why the design was not implemented in Honda vehicles. Thus, just like its position on the center airbag, Honda statements indicated that Honda was not contesting the feasibility of the reverse geometry seat belt design.

Honda's position asserted at both the pretrial conference and its pretrial briefing could not have been clearer. Honda unequivocally represented to this Court and opposing counsel that it was not contesting feasibility for either of Plaintiffs' alternative designs. Although Honda did properly preserve this issue for review, the Court finds that the instruction was not erroneous and that there

is no "substantial and ineradicable doubt" whether the jury was properly guided in its deliberations because of an instruction that was given based on Honda's own pre-trial admissions. *True Believers*, 2020 WL 2113600, at *3. Thus, the Court did not err in honoring Honda's decision in the final jury instructions. *See generally White v. ARCO/Polymers, Inc.*, 720 F.2d 1391, 1396 (5th Cir. 1983) (recognizing that "factual assertions in pleadings and pretrial orders are considered to be judicial admissions conclusively binding on the party who made them"). Just because Honda now regrets its decision does not entitle Honda to a new trial on this basis.

### C.  Instruction on Safer Alternative Design

Under Texas law, proof of a design defect requires proof of a "safer alternative design," which the Court's final jury instructions defined as follows:

> "Safer alternative design" means a product design other than the one actually used that in reasonable probability—
>
> (1)  would have prevented or significantly reduced the risk of the injury in question without substantially impairing the product's utility; and
> (2)  was economically and technologically feasible at the time the product left the control of Defendant by the application of existing or reasonably achievable scientific knowledge.

(Dkt. #136 at p. 7). Honda argues the Court erred in not including the following additional instruction on safer alternative design: "In order to be a safer alternative design, the overall safety of the product must be considered. It is not sufficient that the alternative design would have reduced or prevented the harm the plaintiffs suffered if the alternative design would introduce into the product other dangers of equal or greater magnitude" (Dkt. #139 at p. 11). Honda claims this additional language is included in Texas Pattern Jury Instruction 71.4, and "was necessary so that the jury could know how to properly judge the Plaintiffs' proposed alternative designs" (Dkt. #139 at p. 11).

Honda did not object at trial to the Court's instructions on safer alternative design; instead,

Honda raised an objection to this instruction for the first time in its present motion for new trial. Under Federal Rule of Civil Procedure 51, a party may not later assert that there is an error in a given jury instruction if that party failed to properly object to it during trial. *See* FED. R. CIV. P. 51(d)(1); *see also Turner v. Baylor Richardson Med. Cir.*, 476 F.3d 337, 347 (5th Cir. 2008) (affirming the district court's denial of a motion for new trial on an issue that was not raised at trial). "A party cannot satisfy the requirements of Rule 51 by merely submitting to the court a proposed instruction that differs from the instruction ultimately given to the jury." *Russell v. Plano Bank & Trust*, 130 F.3d 715, 719 (5th Cir. 1997); *see also Alexander v. Conveyors & Dumpers, Inc.*, 731 F.2d 1221, 1227 (5th Cir. 1984) (per curiam) (stating the "court is not compelled to give every instruction offered by the parties.").

    "Where the party challenging the district court's instructions has failed to raise the objection before the district court," the objection is consider waived absent a showing of plain error. *Russell,* 130 F.3d at 721. To demonstrate plain error, the movant has the burden of showing: "(1) that an error occurred; (2) that the error was plain, which means clear or obvious; (3) the plain error must affect substantial rights; [and] (4) not correcting the error would 'seriously affect the fairness, integrity, or public reputation of the judicial proceedings.'" *Highland Ins. Co. v. Nat'l Union Fire Ins. Co.*, 27 F.3d 1027, 1032 (5th Cir. 1994) (quoting *United States v. Olano*, 507 U.S. 725, 736 (1993)). "The requirements of plain error are exacting and the plain error exception is a narrow one that applies only where 'the error is so fundamental as to result in a miscarriage of justice.'" *Russell*, 130 F.3d at 721 (quoting *Johnson v. Helmerich & Payne, Inc.*, 892 F.2d 422, 424 (5th Cir. 1990)); *see also* 9A CHARLES WRIGHT & ARTHUR MILLER, FED. PRAC. & PROC. § 2558 (2d ed. 1995) ("If there is to be a plain error exception to Rule 51 at all, it should be confined to the exceptional case when the error seriously has affected the fairness, integrity, or public

reputation of the trial court's proceedings."); *Highland Ins. Co.*, 27 F.3d at 1032 (noting that "at a minimum" an alleged error must be "clear under the law.").

Here, Honda's objection is properly considered waived unless Honda has satisfied the exacting requirements to establish plain error. *Highland Ins. Co*., 27 F.3d at 1032. But Honda has made no attempt to establish plain error. Therefore, Honda has waived any objection to this instruction.

Moreover, it is not "clear or obvious" that the instruction used by the Court was plainly erroneous. *Id*. The Court's instructions must "correctly and adequately instruct the jury as to the law to be followed in deciding the issues." *Alexander*, 731 F.2d at 1227. Contrary to Honda's allegations, the language Honda requested is not included in Texas Pattern Jury Charge Section 71.4. Rather, Honda's language comes from the case of *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 337 (Tex. 1998), which the pattern jury instructions only generally cite to in the comments to Section 71.4. Thus, the Court's instructions accurately recited the Texas Pattern Jury Charge's definition of safer alternative design. *See also Bagby Elevator Co. v. Schindler Elevator Corp*., 609 F.3d 768, 772–73 (5th Cir. 2010) (finding it persuasive that "Texas courts have repeatedly approved the Texas Pattern Jury Charges as a correct statement of the law."); *Quanta Servs. Inc. v. Am. Admin. Grp. Inc.*, 384 F. App'x 291, 296–97 (5th Cir. 2008) (per curiam) (stating that "[i]t can hardly be an abuse of discretion for a federal district court to charge the jury in a manner pervasively used by the state which provides the governing law.").

To be sure, the Fifth Circuit has directly addressed whether a district court commits reversible error by not including similar language to that which Honda's requested. *See Nester v. Textron, Inc.*, 888 F.3d 151 (5th Cir. 2018). In *Nester*, the defendant argued that the district court erred by not including its requested instruction on safer alternative design. *Id*. at 156. Specifically,

the defendant requested the district court instruct the jury that "a safer alternative design is not just

one that would have prevented the injury in question, but must also be one that would not have

imposed an equal or greater risk of harm under the circumstances." *Id.* (internal citations omitted).

The Fifth Circuit found that the district court's decision did not demonstrate an abuse of discretion,

and did not create a "substantial and ineradicable doubt about whether the jury was properly

guided." *Id.* at 158. Rather, the Fifth Circuit found that the district court's instructions were a

correct statement of the law, complied with the Texas Pattern Charge, and sufficiently apprised

the jury of the relevant legal principles. *Id.*

Thus, under *Nester*, the Court's refusal to include Honda's requested language is no

indication that the Court's instructions were plain error, or that the instructions failed to properly

instruct the jury on the applicable law. Accordingly, because Honda waived this objection and

failed to make any showing of plain error, the Court finds Honda is not entitled to a new trial on

this basis.

## V.        The Note from the Jury

During deliberations, the jury sent a note to the Court that stated the following:

> Can we consider modification to the alternative designs or are we limited to only
> exactly what was presented in evidence? For example, can we consider a larger
> center airbag

(Dkt. #120 at p. 2). The Court responded: "The Court can only refer you back to the Court's

instructions" (Dkt. #120 at p. 3). Honda claims the Court's response was in error.

District courts enjoy wide discretion when responding to jury inquiries. *United States v.

Stevens*, 38 F.3d 167, 170 (5th Cir. 1995). Depending on how the court responds, the court's

response to a jury note can constitute a supplemental instruction to the jury. *Id.* The adequacy of a

supplemental jury instruction is evaluated based on whether it "was reasonably responsive to the

jury's question and whether the original and supplemental instructions as a whole allowed the jury to understand the issues presented to it." *Id.* However, where a court "in response to a jury question . . . directs the jury's attention to the original instructions," a different analysis applies to evaluate the adequacy of the response. *United States v. Marshall*, 283 F. App'x 268, 279 (5th Cir. 2008) (citing *United States v. Arnold*, 416 F.3d 349, 359 n.13 (5th Cir. 2005)). In that case, "the response will be deemed sufficient if the original charge is an accurate statement of the law." *Id.*

Here, the Court's response directed the jury back to the Court's original instructions. Thus, the response was sufficient because the Court's original charge accurately stated the law. *Id.* As discussed in the prior section, the Court's instructions on safer alternative design correctly stated the applicable law and conformed with the Texas Pattern Jury Instructions. The Court also generally instructed the jury that it was to decide this case "entirely on the law and on the evidence presented to you in the courtroom" (Dkt. #136 at p. 2). This general instruction accurately informed the jury of their legal duties and complied with the Fifth Circuit's Pattern Jury Instructions. Therefore, the Court's response to the jury's note directing the jury back to the Court's instructions—which would necessarily include the general instruction on the jury's legal duties and the specific instructions on safer alternative design—was a sufficient response under the law. *Stevens*, 38 F.3d at 170; *Marshall*, 283 F. App'x at 279. Accordingly, Honda is not entitled to a new trial on this basis.

## CONCLUSION

The right to try to a case by jury is a core principle of our adversarial system. But while that right is guaranteed, a favorable outcome is not. At the heart of this case, like many design defect lawsuits, was a battle of the experts. Plaintiffs' experts examined the facts, reviewed data, performed research, and studied tests, and concluded the CR-V was defective. Honda's experts

did the same and concluded the CR-V was not defective. The jury properly exercised its prerogative to resolve this conflicting evidence, and ultimately believed Plaintiffs' experts. While Honda may be displeased with this outcome, the jury's verdict was the result of a fair, honest, and just trial, and thus this Court will not second-guess the jury's decision.

It is, therefore, **ORDERED** that Defendant's Renewed Motion for Judgment as a Matter of Law (Dkt. #138) and Defendant's Motion for New Trial (Dkt. #139) are **DENIED.**

**IT IS SO ORDERED.**

**SIGNED this 7th day of November, 2022.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE